**UNITED STATES of America, Appellee,**

v.

**Josephine CORDERO, etc., Defendant, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**William SORREN, a/k/a Bill, Defendant, Appellant.**

Nos. 80–1011, 80–1015.

United States Court of Appeals, First Circuit.

Argued Sept. 16, 1981.

Decided Dec. 14, 1981.

As Amended on Denial of Rehearing and Rehearing En Banc Jan. 15, 1982.

Harry Anduze Montano, Santurce, P.R., for defendant, appellant Josephine Cordero, Etc.

Harvey B. Nachman, Santurce, P.R., with whom Carlos V. Garcia Gutierrez, Santurce, P.R., was on brief, for defendant, appellant William C. Sorren.

Patty Merkamp Stemler, Atty., Dept. of Justice, Washington, D.C., with whom Raymond L. Acosta, U. S. Atty., San Juan, P.R., and Robert J. Erickson, Atty., Dept. of Justice, Washington, D.C., were on brief, for appellee.

Before CAMPBELL, and BREYER, Circuit Judges, and VAN DUSEN *, Senior Circuit Judge.

BREYER, Circuit Judge.

Appellants, Josephine Cordero and William Sorren, were convicted for conspiracy to import cocaine into the customs territory of the United States, 21 U.S.C. §§ 952[1], 963[2], and of unlawfully using interstate communications facilities to facilitate that conspiracy, 21 U.S.C. § 843(b).[3] The evidence, which in this appeal we view in a light most favorable to the government— *United States v. Stubbert*, 655 F.2d 453, 455–56 (1st Cir. 1981)—suggests the following basic facts. Beginning in late 1978 and thereafter Felix Jimenez, a Drug Enforcement Administration undercover agent posing as a cocaine buyer, began to develop with Sorren plans to smuggle cocaine into Puerto Rico. Sorren is a pilot; he was to be responsible for transporting the cocaine. Subsequently, Sorren introduced Jimenez to Cordero with whom Jimenez thereafter spoke separately. Cordero had contacts with foreign drug dealers; she agreed that she would try to find a cocaine source. After a number of false starts, which will be described below, Cordero reached two men in Colombia: Jose Molina-Sevilla and Adriano Robinson-Whittiker. They agreed to supply the cocaine. In the meantime, Sorren contacted Warren Turner who agreed to help Sorren transport the cocaine.[4] Eventually, Sorren, Turner, Cordero, Robinson-Whittiker and Jimenez met in Panama City, where Jimenez, instead of producing payment, identified the other four to Panamanian authorities as drug dealers. The Panamanians arrested the four and held them in jail. They were then sent by air to Venezuela, and then were sent on to Puerto Rico. Cordero and Sorren

---

* Senior Circuit Judge of the Third Circuit, sitting by designation.

1. § 952.

 (a) It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance in schedule I or II of subchapter I of this chapter, or any narcotic drug in schedule III, IV, or V of subchapter I of this chapter.

 *See* 21 U.S.C. § 812(c), Schedule II(a)(4):

 Unless specifically excepted or unless listed in another schedule, any of the following substances whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis or by a combination of extraction and chemical synthesis.

 (4) Coca leaves and any salt, compound derivative or preparation of coca leaves, and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances....

2. § 963.

 Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

3. § 843(b).

 It shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony under any provision of this subchapter II of this chapter. Each separate use of a communication facility shall be a separate offense under this subsection. For purposes of this subsection, the term "communication facility" means any and all public and private instrumentalities used or useful in the transmission of writing, signs, signals, pictures, or sounds of all kinds and includes mail, telephone, wire, radio, and all other means of communication.

4. The government also filed conspiracy charges against Turner, Molina-Sevilla and Robinson-Whittiker. However, Turner testified for the government in return for dismissal of the charges. Molina-Sevilla has not been arrested. Robinson-Whittiker pleaded guilty on the conspiracy count and was sentenced to four years imprisonment.

were subsequently tried and convicted in Puerto Rico. We affirm their convictions in this appeal. We shall discuss each of their several arguments in turn.

## I

Appellants' preliminary claim is that the circumstances surrounding their arrest and transport to Puerto Rico deprived the federal district court of jurisdiction to try them. Appellants primarily rely upon what is known as the *Toscanino* exception to the *Ker-Frisbie* doctrine.

As we pointed out when Sorren's case was previously before us, *United States v. Sorren*, 605 F.2d 1211, 1215–16 n.5 (1st Cir. 1979), ("*Sorren I*," seeking mandamus), "under the so-called *Ker-Frisbie* doctrine, the forceable abduction of a criminal defendant into the court's jurisdiction does not impair the court's power to try him." *See Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886); *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952). The vitality of this doctrine, which is widely applied throughout the world,[5] has recently been reaffirmed by the Supreme Court. *United States v. Crews*, 445 U.S. 463, 474, 100 S.Ct. 1244, 1251–52, 63 L.Ed.2d 537 (1980);[6] *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).[7]

■ The *Toscanino* exception to the *Ker-Frisbie* doctrine requires a court, in the name of due process, to divest itself of jurisdiction of the person of a criminal defendant "where it has been acquired as the result of the [U.S.] government's deliberate,

unnecessary and unreasonable invasion of the accused's constitutional rights." *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974). This exception, however, has been narrowly interpreted to cover only egregious cases. Thus, in *Toscanino* itself, the " 'unreasonable' invasion of . . . rights included beatings, denial of sleep for prolonged periods, fluids injected in his eyes and nose, and electric shocks administered to his ears, toes, and genitals." *Sorren I*, 605 F.2d at 1215–16 n.5. And, where less outrageous treatment was at issue, the courts have tended to apply *Ker-Frisbie* not the exception. *See, e.g., United States v. Lopez*, 542 F.2d 283 (5th Cir. 1976) (abduction at "instigation" of United States but without direct United States involvement in torture insufficient to divest court of jurisdiction); *United States v. Lara*, 539 F.2d 495 (5th Cir. 1976) (no *Toscanino* violation where defendant failed to show direct United States involvement in torture; forceable abduction without more insufficient); *United States v. Lira*, 515 F.2d 68 (2d Cir.), *cert. denied*, 423 U.S. 847, 96 S.Ct. 87, 46 L.Ed.2d 69 (1975) (no *Toscanino* violation without showing direct United States involvement); *United States ex rel. Lujan v. Gengler*, 510 F.2d 62 (2d Cir.), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975) (seizure of defendant not in violation of treaty or against wishes of foreign government and no showing of "shocking" conduct by United States agents made *Toscanino* inapplicable.). *Sorren I*, 605 F.2d at 1216. *See generally* Henkin, *International Law* 477–78 (2d ed. 1980).[8]

5. *See, e.g., Ex parte Elliot*, 1 All E. R. 373 (K.B.1949) (England); *Geldof v. Meulemeester and Steffen*, 31 I.L.R. 385 (Cour de Cassation 1961) (Belgium); *Attorney General v. Eichmann*, 36 I.L.R. 5 (Dist. Jerusalem 1961), *aff'd*, 36 I.L.R. 277 (S.Ct.1962) (Israel). *But see Case of Nollet*, 18 Journal du Droit International 1188 (Cour d'appel de Douai 1891) and *In re Jolis*, Ann.Dig. 191 (No. 77) (Tribunal Correctionnel d'Avesnes 1933) (France). *See generally* Note, *Extraterritorial Jurisdiction and Jurisdiction Following Forceable Abduction: A New Israeli Precedent in International Law*, 72 Mich. L.Rev. 1087, 1106 *et seq.* (1974).

6. See also the concurring opinions of Justice Powell joined by Justice Blackmun, 445 U.S. at 477, 100 S.Ct. at 1253, and Justice White joined by the Chief Justice and Justice Rehnquist, 445 U.S. at 477, 100 S.Ct. at 1253, *et seq.*

7. *See also Palmigiano v. Houle*, 618 F.2d 877, 878 n.1 (1st Cir.), *cert. denied*, 449 U.S. 901, 101 S.Ct. 272, 66 L.Ed.2d 132 (1980); *Autry v. Wiley*, 440 F.2d 799, 801 (1st Cir.), *cert. denied*, 404 U.S. 886, 92 S.Ct. 219, 30 L.Ed.2d 169 (1971).

8. *See also United States v. Reed*, 639 F.2d 896 (2d Cir. 1981); *Weddell v. Meierhenry*, 636 F.2d 211 (8th Cir.), *cert. denied*, —— U.S. ——, 101

After *Sorren I* and after the subsequent trial, the district court held a hearing outside the presence of the jury to determine the relevant *Toscanino* facts. We have reviewed the record of that hearing with care. It fails to show either the shocking circumstances or the type of U. S. Government involvement in those circumstances which might together bring the *Toscanino* exception into play. The record indicates that U.S. Drug Enforcement Administration agent Jimenez identified Sorren to several Panamanian officials at Sorren's hotel on May 8, 1979. Cordero was arrested by Panamanian authorities the next day at the Panama City airport. Cordero states that she saw Jimenez once again after she was arrested. Both appellants saw an American consul who visited them. Aside from this, however, there is no evidence linking American agents to the appellants' treatment. Indeed, when Sorren's counsel asked co-defendant Warren Turner whether he had seen or heard American agents while he was under arrest, Turner replied that he did not.[9]

More importantly, the record does not show the outrageous conduct involved in *Toscanino*. At worst, it shows poor treatment by the Panamanian authorities and poor conditions in Panamanian jails. When Panamanian officials arrested Sorren they insulted him, pushed him and slapped him. In jail, Sorren was poorly fed, he had to sleep on the floor and had to "huddle up in a corner" to avoid the splashing of urine coming from prisoners in other cells. The Panamanian arresting officers insulted Cordero. They also fed her badly while she was in jail. She had to sleep on the floor or in a chair. These conditions may be poor, unfortunate, hardly decent, but they are a far cry from deliberate torture, and they are beyond the control of American law enforcement authorities and American courts. Were American courts to seek to improve conditions in foreign jails by re-fusing to try those who are temporarily held there, the result would not be better jails, but the creation of safe havens in foreign lands for those fleeing the reach of American justice. Hence, the *Toscanino* exception does not apply here.

■ Appellants seek to bolster their "lack of jurisdiction" claim by arguing that their arrests in Panama and subsequent return to Puerto Rico via Venezuela violated extradition treaties between the United States and those countries. *See* Treaty between the United States of America and the Republic of Panama, Providing for the Extradition of Criminals, May 25, 1904, 34 Stat. 2851; T.S. No. 445; Extradition Treaty January 19–21, 1922, United States of America—United States of Venezuela, 43 Stat. 1968; T.S. No. 675. The procedures used to return them to the United States were quite different from the extradition procedures referred to in these treaties. The short and conclusive answer to appellants' claim, however, is that nothing in these treaties suggests that the countries involved *must* follow the extradition procedures set out in the treaties when they return criminal defendants to the United States. Extradition treaties normally consist of commitments between governments to the effect that each *will return* those accused of certain crimes at the request of the other. *See* H. Kelsen, *Principles of International Law*, 373 (1966). Nothing in the treaty prevents a sovereign nation from deporting foreign nationals for other reasons and in other ways should it wish to do so.

Moreover, insofar as relevant here, extradition treaties are made for the benefit of the governments concerned. *See* I. Brownlie, *Principles of Public International Law*, 307 (2d ed. 1973); Kirkemo, *An Introduction to International Law*, 31–32 (1974); *But cf.* Garcia Mora, International Law and Asylum as a Human Right, 30–51 *passim*,

S.Ct. 2024, 68 L.Ed.2d 329 (1981); *United States v. Valot*, 625 F.2d 308 (9th Cir. 1980); *United States v. Lovato*, 520 F.2d 1270 (9th Cir.), *cert. denied*, 423 U.S. 985, 96 S.Ct. 392, 46 L.Ed.2d 302 (1975).

9. Cordero testified, as we said, she saw agent Jimenez once.

133–36 (1956). And, under international law, it is the contracting foreign government, not the defendant, that would have the right to complain about a violation. *United States v. Reed*, 639 F.2d 896, 902 (2d Cir. 1981); *United States ex rel. Lujan v. Gengler*, 510 F.2d at 67–68. The record here provides no basis for any inference that either Panama or Venezuela objected to appellants' departure from their territories. To the contrary, it was Panamanian and Venezuelan authorities who deported them. *Cf.* 88 Harv.L.Rev. 813, 818–19 (1975).

The cases that appellants cite to do not support their position. *Cook v. United States*, 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641 (1933) and *Ford v. United States*, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793 (1927) concerned a "liquor treaty" which, in light of its language and surrounding circumstances, the Supreme Court held specifically to forbid certain seizures on the high seas and to be self-executing. *Cook v. United States*, 288 U.S. at 119, 53 S.Ct. at 311. *See* Dickinson, *Are the Liquor Treaties Self-Executing?*, 20 Am.J.Intl.L. 444 (1926). As the Fifth Circuit Court of Appeals noted in *United States v. Postal*, 589 F.2d 862, 875 (5th Cir.), *cert. denied*, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979), "*Cook* and *Ford* must be viewed in the fuller context of treaty law to appreciate their reasoning, for it is not sure that every treaty to which the United States is a party acts to limit the jurisdiction of its courts." *See* 88 Harv. L.Rev. 813, 820 *et seq.* (1975). To hold that extradition treaties *forbid* foreign nations to return criminal defendants except in accordance with the formal procedures they contain, would insofar as we are aware,

represent a novel interpretation of those treaties. Under any such interpretation, extradition treaties would hinder, rather than help serve, the return of those accused of crimes within American jurisdiction. We therefore reject appellants' arguments.[10]

## II

Appellants' primary claim is that the evidence is insufficient to support their convictions. Essentially, Sorren and Cordero each argue that there is no evidence to show that they conspired with each other—as charged in the indictment. For the sake of argument, they may be taken to admit that the evidence might be sufficient to show separate conspiracies: one involving Sorren and Turner and the other involving Cordero and the drug suppliers. Cordero adds that there is no evidence that she knew the drugs were bound for the *Commonwealth of Puerto Rico* or anywhere else within the customs territory of the United States. We reject these contentions because we have found adequate evidence to support appellant's convictions. The evidence, as we read it, provides more than adequate support for the following:

Agent Jimenez first met Sorren in the British West Indies on July 22, 1978. Sorren told Jimenez that he transported narcotics. Jimenez told Sorren that he financed narcotics transactions. A few weeks later, in San Juan, Puerto Rico, Sorren offered Jimenez his services and told Jimenez that he would try to find cocaine sources. On August 25, 1978, Sorren called Jimenez and offered to introduce him to "good people." On November 3, 1978, Sorren flew Jimenez from St. Maarten to San-

10. *Ker-Frisbie* also disposes of appellant Sorren's claim that the district court erred in refusing to issue a subpoena ordering the Drug Enforcement Administration to provide defendants with a copy of its Agent's Manual and Domestic Directive Guidelines. Sorren's request for a subpoena was presumably based upon a desire to show that the American DEA agents exceeded the limits of their authority contained in the guidelines. Even if this authority was exceeded, however, that fact alone is insufficient, under *Ker-Frisbie*, to deprive the courts of jurisdiction over the appellants.

There is nothing in the circumstances present here that could make any such showing relevant to the result. *See United States v. Nixon*, 418 U.S. 683, 702, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974); *United States v. Lieberman*, 608 F.2d 889, 904 (1st Cir.), *cert. denied*, 444 U.S. 1019, 100 S.Ct. 673, 62 L.Ed.2d 649 (1980) (absent a showing of arbitrariness or lack of support on the record an appellate court should not disturb the trial court's determination as to the need for enforcing a subpoena *duces tecum*.)

to Domingo in Sorren's plane. *En route* Sorren explained to Jimenez how he made air drops of narcotics onto a small island near Puerto Rico. When they landed in Santo Domingo, Sorren introduced Jimenez to Cordero. Cordero took Sorren and Jimenez to a hotel. In Sorren's room Sorren told Jimenez that Sorren and Cordero had previously been involved together in narcotics transactions. Sorren told Cordero to call a German friend of his in Colombia—Eckhard Biel—who owned a cocaine laboratory in Chile. The next day Cordero and Sorren reached Biel. Sorren talked to Biel and reported to Jimenez that Biel, after he returned from a trip abroad, might do business. (Evidently, Biel did not do business with appellants and they turned elsewhere.)

■ From February, 1979 on, Jimenez spoke to appellants often by telephone.[11] The recordings of these conversations indicate that Sorren and Cordero had spoken to each other about dealing in narcotics with Jimenez and that they had spoken to each other about contacting a Colombian source of supply. On February 24, 1979, for example, Sorren told Jimenez:

> I talked to Josie [Cordero] ... she is ready to go ... she wants me to give her phone number and you call her and get everything straight. And then call me back and let me know what's happening.

Sorren added

> when you all decide when you're going, let me know and I may come down and send a friend of mine with you.

Jimenez called Cordero in Miami. She told Jimenez that Sorren

> called me and told me to try to track down my friend on the other side .... I have been trying to communicate with him, but have not been able to do ... I will try again tonight.

When Jimenez asked Cordero what he meant by "the other side," she said

Santa Marta, Colombia ... because he lives there at Santa Marta.

Other recordings show that Cordero was eager to reach a supply source in Colombia, that she tried to do so, but that for a long time she was unable to contact the source. She told Jimenez that she and Sorren had discussed the matter. She stated, for example, that "Bill [Sorren] told me ... to talk ... [to the Colombian dealer] to see if he was willing to receive us and if he is still making business." On February 27, 1979 Cordero told Jimenez that she had spoken with Sorren the previous day and that "he told me to tell you to call him." When Jimenez said it was difficult for him to call Sorren from Puerto Rico, Cordero told Jimenez that it was ."OK, when he calls me then I will tell him to call you." She also told Jimenez on this and other occasions numerous details about her friend, the drug supplier, in Colombia.

On March 1, 1979 Cordero contacted her friend in Colombia, through his sister. She told Jimenez that the dealer would like to meet with him in Colombia but would go to Curacao or Aruba to discuss details. As to Sorren's involvement in the plan she said, "he was the one who told me do the talks." She added, on March 2, 1979, that she had "already talked" to Sorren about the plans. She also added that Sorren had told her that he wanted to go with Jimenez and her to Aruba to meet the Colombians and that she should ask Jimenez for the money for her plane ticket. When Jimenez called Sorren a few moments later, Sorren appeared to be well aware of the coming meeting with the Colombia drug sources in Aruba. He asked Jimenez "Now, where are we going to meet? In Aruba?"

On March 12, Jimenez again called Sorren who told Jimenez that he had just spoken to Cordero who had not yet been able to talk to her Colombian source to confirm the Aruba meeting. He added that he was

11. The government presented recordings of several of their phone conversations as evidence. While Cordero complains that admission of these conversations violates her constitutional rights, *United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979) holds the contrary. In that case the Supreme Court stated that "the Fourth Amendment [provides] no protection to an individual against the recording of his statements by the IRS agent to whom he was speaking." *U.S. v. Caceres*, 440 U.S. at 750, 99 S.Ct. at 1471.

expecting a call from Cordero the next day. On March 13, Jimenez called Cordero. She asked him about how much cocaine would be involved and what her share of the business would be. Cordero wanted to know whether Jimenez or Sorren was the one in charge. Jimenez said that he was "running the show" and that Sorren was just to do his job. Cordero, Jimenez explained, was to be a partner. Cordero then said that she wanted to be able to deal with Jimenez and no one else insofar as her own share in the affair was concerned. She said she had had previous relations with Sorren which would make dealing with him difficult. She told Jimenez she did "not want to deal with [Sorren] because he and I are friends . . . of a certain type. Because Bill [Sorren] and I are friends already for about ten years. That he knows me and I know him, that is, and for me it's very hard to make business with him." She said she wanted "nothing to do with Bill." She added that he was "somewhat strange" and "somewhat irresponsible." Cordero suggested that they not bring Sorren to the meeting with the Colombians, but Jimenez made very clear that Sorren's job would be to transport the cocaine and Cordero said "OK."

A few days later, on March 20, 1979, Jimenez met Cordero in Miami. He told her that Sorren seemed unwilling to go to Colombia to pick up the cocaine. Cordero said she has another friend who could fly the airplane if Sorren would not do it. Jimenez added that he would prefer to use Sorren. Jimenez also testified that he told Cordero that she would be a full partner in the enterprise. He testified "I told her that if we were going to purchase one kilogram of cocaine for $20,000 and I could sell that same kilogram of cocaine in the United States for $30,000 then after paying the transportation expenses, the profit between twenty and thirty thousand dollars [was] going to be divided in three equal ways."

Some days after their meeting in Miami, on March 23, 1979, Jimenez again spoke to Cordero by phone. The recording of that conversation reveals that Cordero told Jimenez that she had talked to "her man" who said that he could get "the sugar." They decided to meet this man in Aruba and they set a date. Cordero asked Jimenez if he was going to call Sorren. She said "you can find out . . . if he is willing to go." Jimenez agreed to send Cordero $1,000 for travel expenses to Aruba and they discussed a specific date for the Aruba meeting.

A few days later on March 27, Cordero and Jimenez again discussed the Aruba meeting. Cordero told Jimenez she had spoken to Sorren but "said nothing to him." She said she told Sorren to talk to Jimenez "because he is the one who is directing this dealing." She repeated to Jimenez that if Sorren did not want to participate she could find another pilot.

The next day Jimenez again talked to Cordero. He told her that he had decided to use Sorren as the pilot and asked whether she agreed. She said "well, you know, you are the one running the show, [it] is up to you. . . ." She added that she did not want to deal directly with Sorren. In the same conversation, Jimenez and Cordero talked about Sorren's friend Turner, who would help with the transportation, and about taking the cocaine from Colombia to Guadeloupe and from Guadeloupe to Puerto Rico. In this conversation with Cordero, Jimenez makes clear that Sorren will be the pilot. Cordero is clearly aware that the cocaine will be transported "from Guadeloupe to San Juan." [12]

Subsequently, on March 28, 1979, Jimenez sent Cordero $1,000 for travel and set the final details of the Aruba meeting. Late in the night of March 31, and early in the morning of April 1, 1979, Jimenez and Cordero met in Aruba with the two Colombians, Jose Molina-Sevilla and Adriano Robinson-Whittiker, to discuss arrangements

12. In light of this conversation and a subsequent recorded conversation taking place on April 20, 1979 in which Jimenez tells Cordero specifically that "the plane takes off . . . picks up the material and keeps on to, to San Juan," Cordero's claim of lack of evidence showing that she knew the cocaine was to be transported into United States customs territory is frivolous.

for supplying the cocaine. The Colombians wished to charge $35,000 per kilo and did not want to deliver the cocaine anywhere outside of Colombia. Jimenez said the price was too high and he wanted delivery elsewhere.

During April 1979, Jimenez spoke by phone to Cordero, He said that he would make transportation arrangements with Sorren and Cordero would coordinate with the sources. They considered using Cordero's brother-in-law as a pilot but eventually decided to keep Sorren and Sorren's friend Turner. They developed a final plan: the Colombians, Cordero, Sorren, Turner and Jimenez, would meet in Panama City and transfer part of the money there. Turner would fly Molina-Sevilla, Cordero and Sorren to Colombia to obtain the cocaine. Jimenez and Robinson-Whittiker would remain in Panama with the rest of the money. Jimenez would give Robinson-Whittiker the rest of the money once he heard that the cocaine had been delivered. Jimenez and Cordero agreed upon this plan. Cordero would make the arrangements with the Colombians. Jimenez was to deal with Sorren.

On April 20, Jimenez spoke to Sorren. He told ·Sorren that he had spoken to Cordero. He also made the final arrangements for transporting the cocaine. Sorren and his friend Turner were to take the cocaine from Colombia to Guadeloupe and then, changing planes, on to Puerto Rico. On April 27, Jimenez and Alberto Fernandez, another DEA agent posing as Jimenez's partner, went to Curacao where they met Sorren and Turner. The four of them went on to Panama by commercial flight.[13] Cordero arrived in Panama City and met them on May 2. On the night of May 3, Jimenez met with Cordero, Sorren and Turner at Cordero's hotel. Cordero and Sorren each asked for $1,000 to cover their expenses. The following day Jimenez met Cordero, Sorren and Turner and gave $500 to Cordero and $500 to Sorren and Turner

for their expenses. On each occasion Cordero and Jimenez talked about the Colombian sources. They agreed that Cordero should fly to Colombia in an effort to bring Molina-Sevilla and Robinson-Whittiker to Panama City more quickly. On May 5, Sorren called Jimenez, told him that Cordero had called from Colombia and added that the Colombians would not be able to travel by May 7. But the following day Sorren again called Jimenez and told him that Cordero had called to report that Robinson-Whittiker would arrive in Panama City on May 7. Cordero later told Sorren that Robinson-Whittiker would arrive not on the 7th but on the 8th. Sorren passed the message along to Jimenez. Then on the 8th, Sorren called Jimenez to tell him that Robinson-Whittiker had arrived. Jimenez went to Robinson-Whittiker's hotel where he met with Robinson-Whittiker, Sorren and Turner. At this meeting Robinson-Whittiker told Jimenez that he wanted the money placed in a bank in Aruba and that Jimenez, Sorren and Turner should take the money there. Jimenez agreed. Soon thereafter Jimenez contacted the Panamanian authorities who arrested Sorren, Robinson-Whittiker, Turner and, the next day, Cordero.

█ Given this evidence in the record—most of which takes the form of recordings of the actual words used by Sorren and Cordero in telephone conversations—we find it difficult to understand appellants' claim that there is inadequate evidence for a jury to find that they engaged in a single conspiracy to import cocaine into Puerto Rico. Sorren not only knew of Cordero's involvement, but he himself actively transmitted key messages from Cordero to Jimenez while Cordero was in Colombia. The transmission of these messages amounted to arranging for a meeting among all participants to take place in Panama City—a meeting at which the sale of the cocaine would effectively take place. Similarly, Cordero not only used Sorren to transmit

---

**13.** The plans to fly to Panama City in Sorren's plane had to be changed. In Curacao, Sorren informed agents Jimenez and Fernandez that he could not fly his plane to Panama because he was afraid of the radar.

these messages, but she also knew that Sorren, along with Turner, was to transport the cocaine to Puerto Rico. Indeed, after a certain initial hesitancy, she explicitly agreed with Jimenez that Jimenez should arrange for Sorren to do so. ·

The evidence set out is certainly sufficient for a jury to conclude that there was an explicit agreement among all the parties involved, indeed that there was a meeting of the minds of Sorren and Cordero as well as of Jimenez. *See United States v. Benmuhar*, 658 F.2d 14, 16–17 (1st Cir. 1981). It is clear that Cordero and Sorren each knew of the other's role in the enterprise and each knew that the other's role was essential for the success of the enterprise. Each agreed to participate knowing that the other would play this role. Each assented to the other's playing this role. At a minimum, these facts show an implied or tacit understanding that all would work together—and such an understanding is sufficient to constitute a conspiracy. *United States v. Vargas*, 633 F.2d 891, 899 (1st Cir. 1980).[14] Indeed, the courts have held that a single agreement and hence a single conspiracy, may exist even when parties do not know the identity of one another and are not aware of all the details of a plan of operation. *United States v. Benmuhar, supra*. The simple fact that a member of a conspiracy knows that another is likely to play a significant role is sufficient to show a conspiracy between the party and that other—even to the point where the party can be held liable for the crimes of the other committed in the course of the overall conspiracy. *See Blumenthal v. United States*, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947), *United States v. Stubbert*, 655 F.2d 453 at 456 (1st Cir. 1981); *United States v. Morado*, 454 F.2d 167, 169–72 (5th Cir.), *cert. denied*, 406 U.S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116 (1972). Far more than this minimal type of link between Sorren and Cordero was shown here.

Cordero claims that she did not want Sorren to participate; that she wanted to deal with Sorren only through Jimenez. But her preferences for another pilot are not determinative. Even if such were her wishes, she nonetheless joined the conspiracy knowing that Sorren was an essential part of it. *See Blumenthal v. United States*, 332 U.S. at 555, 68 S.Ct. at 255–56 et seq. Moreover, the record shows that Cordero dealt with Sorren directly on numerous occasions. It also shows that after expressing a preference that someone else be hired, she agreed that Sorren would be asked to transport the cocaine. Nor do we see how Sorren can successfully claim that he was not directly involved with Cordero in the face of a record that shows, at a minimum, that he directly participated with Cordero in arranging the Panama City meeting. There is sufficient evidence to support the jury's conclusion that there was one single conspiracy in which both Cordero and Sorren participated. *See United States v. DiGregorio*, 605 F.2d 1184, 1192 (1st Cir.), *cert. denied*, 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 197 (1979), *United States v. Morado*, 454 F.2d at 169–72.[15]

---

**14.** *See* W.R. LaFave & A.W. Scott, *Handbook on Criminal Law*, 460–63 (1972); R.A. Anderson, *Wharton's Criminal Law and Procedure* § 83 (1957).

**15.** Our previous discussion is dispositive of the variance arguments of the appellants since as we have noticed the evidence provides plenty of support for the conviction for one sole conspiracy. *Compare United States v. Izzi*, 613 F.2d 1205 (1st Cir.), *cert. denied, sub nom. Santos v. United States*, 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 793 (1980).

It also disposes of Sorren's consistency argument. The so-called consistency rule adopted by some courts for conspiracy cases, requires the acquittal of a defendant when all his co-conspirators have been acquitted. *See United States v. Rivera Diaz*, 538 F.2d 461 (1st Cir. 1976); *United States v. Pena*, 527 F.2d 1356, 1364–65 (5th Cir.), *cert. denied*, 426 U.S. 949, 96 S.Ct. 3168, 49 L.Ed.2d 1185 (1976). However, the consistency claim of Sorren in this case rests on two false premises: first, that he only conspired with Turner—see our discussion *supra*—and, second, that the dismissal of Turner's indictment in exchange for his testimony is equivalent to an acquittal. *See Cross v. United States*, 392 U.S. 360, 362 (8th Cir. 1968). *See also generally* Marcus, *Conspiracy: The Criminal Agreement in Theory and Practice*, 65 Geo.L.J. 925 (1977).

We are disturbed by the fact that appellant Cordero's brief, while purporting to set forth all the significant evidence and claiming that it was insufficient for conviction, did not refer to more of the unfavorable evidence we have discussed here. Indeed, in light of the conversations described in footnote 12, we do not see how the brief could suggest an absence of any evidence that Cordero knew the cocaine was bound for Puerto Rico. While forceful advocacy is desirable, overstatement, by engendering mistrust, can work to the ultimate disadvantage of a client.

### III

 Appellants claim that, as a matter of law, they could not have "knowingly or intentionally" used "any communication facility in committing or in causing or facilitating the commission of ... a felony"—21 U.S.C. § 843(b)—for they spoke only with Jimenez, a government agent. Essentially they claim that since Jimenez was responsible for frustrating their criminal activities, conversations with him could not have *furthered* those activities. We do not agree. As the facts set out above reveal, the telephone calls between Jimenez and Sorren very much facilitated the development of the conspiracy that was charged. Jimenez was, of course, a government agent, but he also transmitted information given him from Sorren to Cordero and from Cordero to Sorren. This flow of information was important in the development of the conspiracy. *United States v. Fontanez*, 628 F.2d 687, 690 (1st Cir.), *cert. denied*, 450 U.S. 935, 101 S.Ct. 1401, 67 L.Ed.2d 371 (1981). The participation of a government agent in a conspiracy does not negate the existence of that conspiracy nor make it any the less a violation of the law. *See Fontanez, supra*; W.R. LaFave & A.W. Scott, *Handbook on Criminal Law* § 61 at 461–62 n.99 (1972). We fail to see, then, why the fact that telephone calls facilitating the development of a conspiracy also involving the participation of a government agent makes them any the less a violation of 21 U.S.C. § 843(b).[16]

### IV

Appellants claim that the facts of this case show that proper venue for their trial did not lie in Puerto Rico. Cordero also argues that the government "failed to prove ... beyond a reasonable doubt" that "an overt act in furtherance of the conspiracy" took place in that district.

 It is true that under 18 U.S.C. § 3237(a) venue lies in Puerto Rico only if the offense "was begun, continued or completed" there.[17] However, as appellants correctly point out, the statutory venue standard may be satisfied as long as "any act in furtherance of the conspiracy" is committed in Puerto Rico even if the conspirators are not "physically present" there.

---

16. Cordero contends that she cannot be convicted of violating the statute because she "did not put or bring into action" any call but instead only responded to the agent's calls. We are aware of no authority which suggests the term "use" in the statute refers solely to "placing" calls and leaves unpunished use of the telephone by the receiver of a call. *See* H.R. Rep.No. 91–1444, 91st Cong., 2nd Sess. (1970), U.S.Code Cong. & Ad.News 4566, 4616. *See also United States v. Jones*, 612 F.2d 453, 457 (9th Cir.), *cert. denied*, 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980). We see no reason in this case to depart from the ordinary meaning of the word "use." ("To put into action or service: have recourse to or enjoyment of ... make instrumental to an end or process: apply to advantage ... utilize ... employ ... apply, avail." *Webster's Third New International Dictionary* 2523–24 (4th ed. 1976)).

17. Article III, section 2, paragraph 3 of the Constitution of the United States provides that "The Trial of all Crimes ... shall be held in the State where said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed." To deal with continuing offenses such as conspiracy Congress enacted 18 U.S.C. § 3237(a). Section 3237(a) establishes that "any offense against the United States begun in one district and completed in another, or committed in more than one district may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." Indeed, this section was originally enacted as part of a statute defining conspiracy, and is regularly applied to such cases. C.A. Wright, *Federal Practice and Procedure (Criminal)* § 303 (1969).

C.A. Wright, *Federal Practice and Procedure (Criminal)* § 303 (1969). *Cf. Hyde v. United States*, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912).

Contrary to appellants' argument there is evidence that meets this standard. Sorren and Cordero spoke to Jimenez while he was in Puerto Rico and provided him with key information, which was then communicated to others. The fact that Jimenez placed the calls to Cordero and to Sorren who were outside the Commonwealth, does not change the fact that Cordero and Sorren transmitted this information through Jimenez who was inside Puerto Rico. *Galatas v. United States*, 80 F.2d 15, 24 (8th Cir.), *cert. denied*, 297 U.S. 711, 56 S.Ct. 574, 80 L.Ed. 998 (1936). *Cf. United States v. Snead*, 527 F.2d 590, 591 (4th Cir. 1975).[18] Moreover, they knew he was in Puerto Rico and they knew the offense was bound for completion in Puerto Rico. It is not as if Jimenez were a traveler making chance use of a telephone at a bus stop. Thus, we think it highly likely that the offense was "continued" in Puerto Rico.

■ However, in any event, appellants raised the venue question in the district court too late. They raised it for the first time in a motion to acquit made on December 10, 1979, twenty days after the jury returned its guilty verdict. The purpose of a venue motion is to protect defendants from the inconvenience of defending charges in a distant place having no connection with the offense. *See Travis v. United States*, 364 U.S. 631, 634–35, 81 S.Ct. 358, 360–61, 5 L.Ed.2d 340 (1961); *Platt v. Minnesota Mining & Manufacturing*, 376 U.S. 240, 245, 84 S.Ct. 769, 772, 11 L.Ed.2d 674 (1964). A defendant may waive venue ob-

jections. C.A. Wright, *supra* § 306. Thus, the courts have consistently ruled that a claim of improper venue must be raised at least prior to a verdict. *United States v. Black Cloud*, 590 F.2d 270, 272 (8th Cir. 1979); *United States v. Haley*, 500 F.2d 302, 305 (8th Cir. 1974). Since defendants may waive venue and since it is not an element of the offense,[19] the government will not necessarily seek to prove the necessary connection unless the defense warns the government that the matter is at issue.[20] The very reason given by defendants to excuse their failure to raise the issue earlier, namely that doing so "would be tantamount to warning the prosecution" to provide evidence of "a connection" of the conspiracy "with Puerto Rico," is precisely why defendants are required to raise the motion earlier. The purpose of a trial is "to determine the merits of the charges," not to secure victories through surprise or manipulation. *United States v. Kampiles*, 609 F.2d 1233, 1239 (7th Cir. 1979); *United States v. McDonough*, 603 F.2d 19, 23 (7th Cir. 1979).

## V

Appellant Cordero claims that she was deprived of a right of a speedy trial as guaranteed her by the Sixth Amendment to the Constitution and the Speedy Trial Act, 18 U.S.C. §§ 3161 *et seq.* (Supp.1981). The Act requires that "the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date . . . of the information or indictment or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1).

---

18. Cordero is wrong in stating that the fact that Jimenez was in Puerto Rico must be proved "beyond a reasonable doubt." Venue is not an element of the offense and need be proved only by a preponderance of the evidence. *United States v. Kampiles*, 609 F.2d 1233, 1238–39 (7th Cir.), *cert. denied*, 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980); *United States v. McDonough*, 603 F.2d 19, 22 (7th Cir. 1979); *United States v. Powell*, 498 F.2d 890, 891 (9th Cir.), *cert. denied*, 419 U.S. 866, 95 S.Ct. 121, 42 L.Ed.2d 103 (1974).

19. See note 18, *supra*.

20. Since the failure to show whether an offense was committed in the trial district "will frequently be the result of inadvertence or neglect," in an appropriate case the trial judge has been allowed to reopen the case to allow proof of venue. *See United States v. Kampiles*, 609 F.2d at 1239; *United States v. McDonough*, 603 F.2d at 23.

The seventy-day period, however, was enlarged by 18 U.S.C. § 3161(g) to 180 days for all offenses charged in informations or indictments filed on or after July 1, 1976, 120 days for offenses charged in informations or indictments filed on or after July 1, 1977, and 80 days for offenses charged in informations or indictments filed on or after July 1, 1978 and before July 1, 1979. 18 U.S.C. § 3163(b)(1). *See* S.Rep.No. 212, 96th Cong., 1st Sess. 11–12 (1979). Since Cordero was indicted on May 23, 1979, the time period of "eighty days" applies in her case.[21] Cordero pleaded guilty on August 13, 1979, eighty-two days after her indictment and seventy days after her arraignment. She agrees that enough days during this period were "excluded" from being counted as part of the "speedy trial period" that her detainment until August 13, 1979, does not violate the law.[22]

On September 18, 1979, Cordero withdrew her guilty plea and her case was set for trial. The trial began on November 6, 1979, forty-nine days later. The Speedy Trial Act specifically provides that when a defendant pleads guilty but later withdraws that plea "the defendant shall be deemed indicted . . . on the day the order permitting withdrawal of the plea becomes final." 18 U.S.C. § 3161(i).[23] Since only forty-nine days elapsed from this date to the time of trial, it is plain that the legal time limit was not exceeded.

Cordero seeks to overcome this language by pointing to a different provision of the Speedy Trial Act, namely, 18 U.S.C. § 3164(b), which requires the trial to "commence not later than ninety days following the beginning of . . . continuous detention." She adds that her detention began on or before May 23, 1979, the trial began on November 6, 1979, and that therefore this ninety-day time limit was exceeded. The "continuous detention" referred to in this provision, however, is specified in the statute as "detention solely because" a person "is awaiting trial." 18 U.S.C. § 3164(a)(1). Although Cordero's trial did not begin until November 6, 1979, and that date was perhaps up to 177 days after she was first placed in detention, the period of detention between her plea of guilty and its withdrawal was not detention "solely" because of her "awaiting trial." During that period she was not awaiting trial. Hence, her detention was not "continuous." Upon the guilty plea's withdrawal the ninety-day period began to run anew, and her trial began prior to its expiration. To interpret the statute in this way is consistent with the plain meaning of its words, but it is not overly technical. Any other interpretation would allow defendants to plead guilty, await the passage of time, seek to change their plea and, if successful, escape custody. We see no statutory purpose served in interpreting the statute to allow such a result.[24]

### VI

Cordero finally claims that 21 U.S.C. § 963 does not authorize the sentencing judge to impose a special parole term upon a defendant convicted for violating 21 U.S.C. § 963. The government concurs.[25]

---

**21.** The government does not take into consideration this fact and argues on the basis of a seventy day period. As we will see, this makes no difference.

**22.** Cordero agrees that at least twelve days are to be excluded under the provisions of 18 U.S.C. § 3161(h) as being accounted for by motions such as motions for discovery, motions to reduce bail and others.

**23.** By this date, September 18, 1979, the ordinary seventy-day requirement of § 3161(c)(1) was finally in force.

**24.** These facts are also sufficient to dispose of appellant's Sixth Amendment claim. Appellant has advanced no argument other than the continuous period of incarceration in support of her argument that the Sixth Amendment was violated. *Cf. Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *United States v. Johnson*, 579 F.2d 122, 123 (1st Cir. 1978); *United States v. Butler*, 426 F.2d 1275 (1st Cir. 1970).

**25.** Sorren also received a special parole term, although he does not challenge it on this appeal. We understand that, if Sorren files a motion with the district court to correct his sentence, Fed.R.Crim.P. 35(a), the government will not oppose it.

We agree that the district court erred in this respect. *Bifulco v. United States*, 447 U.S. 381, 400–01, 100 S.Ct. 2247, 2259–60, 65 L.Ed.2d 205 (1980); *see United States v. Noble*, 653 F.2d 34, 37 (1st Cir. 1981); *United States v. Pratt*, 645 F.2d 89, 91 (1st Cir. 1981); *United States v. Bienvenue*, 632 F.2d 910, 915–16 (1st Cir. 1980).

We vacate that part of the sentence imposed upon Cordero that establishes a special parole term. With that exception, for the reasons stated, we affirm the judgment of the district court as to both Cordero and Sorren.

*Affirmed in part and reversed in part.*