510 F.2d 62
 UNITED STATES of America ex rel. Julio Juventino LUJAN, on
the petition of Frank A. Lopez, Petitioner-Appellant,
v.
Warden Louis GENGLER, Superintendent, Federal Detention
Headquarters, New YorkCity, and Hon. David G. Trager, United
States Attorney for the Eastern Districtof New York, and any
other person having custody and control of the
relator,Respondents-Appellees.
 No. 449, Docket 74--2084.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 6, 1974.
Decided Jan. 8, 1975.
Certiorari Denied June 2, 1975.
See 95 S.Ct. 2400.
 
 Frank A. Lopez, Brooklyn, N.Y., for petitioner-appellant.
 Edward R. Korman, Chief Asst. U.S. Atty., E.D.N.Y., for respondents-appellees.
 Before KAUFMAN, Chief Judge, and ANDERSON and OAKES, Circuit Judges.
 IRVING R. KAUFMAN, Chief Judge:
 
 
 1
 The facts of this case present elements one might expect to encounter in a grade-B film scenario--an organized underworld conspiracy to import massive quantities of heroin into the United States, and American agents kidnapping the leading perpetrators from South America to bring them to trial. Our role in this drama is to determine whether our recent decision in United States v. Toscanino, 500 F.2d 267 (2d Cir. 1974), petition for rehearing en banc denied, 504 F.2d 1380 (1974) (Mulligan and Timbers, JJ., noting their dissent from the denial of the petition for en banc consideration),[1] precludes the court below from asserting jurisdiction over the protagonist, Julio Juventino Lujan, an Argentine citizen. We conclude that Toscanino does not extend to Lujan's case, and affirm the judgment of the district court.
 
 I.
 
 2
 A grand jury empanelled in the Eastern District of New York indicted Lujan and eight others on July 19, 1973, charging them with conspiracy to import and distribute a large quantity of heroin. The conspiracy described was wide-ranging, involving overt acts in France, Brazil, Uruguay, Peru, Mexico, and Queens, New York, and the quantities of heroin involved were enormous. Arrest warrants were issued for all defendants with the exception of Francisco Toscanino, the subject of our earlier decision, who had been convicted two weeks earlier on another conspiracy to import 18 1/2 kilograms of heroin. The warrant for Lujan's arrest commanded any special agent of the Drug Enforcement Administration, United States Marshal or Deputy Marshal to bring him before the District Court for the Eastern District of New York.
 
 
 3
 Accepting, as we must for purposes of this appeal, that Lujan's allegations are true, the arrest warrant was enforced in an unconventional manner. Lujan, a licensed pilot, was hired in Argentina by one Duran to fly him to Bolivia. Although Duran represented that he had business to transact there with American interests in Bolivian mines, he in fact had been hired by American agents to lure Lujan to Bolivia. When Lujan landed in Bolivia on October 26, 1973, he was promptly taken into custody by Bolivian police who were not acting at the direction of their own superiors or government, but as paid agents of the United States. Lujan was not permitted to communicate with the Argentine embassy, an attorney, or any member of his family.
 
 
 4
 On the following day the Bolivian police, commanded by Police Major Guido Lopez, took Lujan from Santa Cruz to La Paz, where he was held until November 1, 1973. On that date a Lieutenant Terrazas and other Bolivian police, acting together with American agents, brought Lujan to the airport and placed him on a plane bound for New York. Upon his arrival at Kennedy Airport Lujan was formally arrested by federal agents. At no time had he been formally charged by the Bolivian police, nor had a request for extradition been made by the United States.
 
 
 5
 Lujan was arraigned on the day of his arrival, and pleaded not guilty. After this court's decision in Toscanino, Lujan took steps to challenge the manner in which he was brought to the United States. A series of procedural moves ensued,[2] but the posture of the case before us is relatively straightforward. Judge Mishler dismissed without a hearing Lujan's petition for a writ of habeas corpus on June 21, 1974, and Lujan appeals.
 
 II.
 
 6
 Since Lujan's allegations are to be measured against Toscanino, the facts of that case must be presented in some detail. Toscanino, an Italian citizen, alleged that he had been kidnapped from his home in Montevideo, Uruguay, brought to Brazil, and taken from that country to stand trial in the United States, all at the illegal instigation of the United States government. The particular circumstances of the abduction, if Toscanino's claims are true, represent government conduct appropriately condemned as most inhuman.
 
 
 7
 Toscanino charged and was prepared to establish that on January 6, 1973, he and his seven-month pregnant wife had been lured to a deserted area in Montevideo by seven Uruguayan policemen, acting as paid agents of the United States government. Toscanino was knocked unconscious with a gun in full view of his wife, bound and blindfolded, and thrown into the rear seat of a car. During a long and circuitous trip to the Brazilian border his abductors dodged the Uruguayan authorities, and at one point, a gun was placed to Toscanino's head to compel him to lie quietly while a Uruguayan military convoy passed.
 
 
 8
 Toscanino was eventually brought to Brasilia, where over a period of seventeen days he was incessantly subjected to brutal torture and interrogation by Brazilians acting as agents of the United States government. His captors, he claimed, denied him sleep and all forms of nourishment for days at a time. He was fed only intravenously in amounts barely sufficient to keep him alive. He was compelled to walk up and down a hallway for seven or eight hours at a time, and when he fell, was kicked and beaten. To induce him to respond to the interrogation, his fingers were pinched with metal pliers, alcohol was flushed into his eyes and nose, and other fluids were forced in his anal passage. Electrodes were attached to his earlobes, toes, and genitals, and electricity was shot throughout his body, leaving him unconscious for periods of time.
 
 
 9
 Throughout this period, Toscanino asserted, the United States government and the United States Attorney for the Eastern District of New York were aware of the interrogation and received reports of its progress. Moreover, a member of the Bureau of Narcotics and Dangerous Drugs of the Department of Justice was present at times, and actually participated in some of the interrogation.
 
 
 10
 Eventually, Toscanino claimed, he was drugged and flown to New York. He awakened when the aircraft reached the United States. Upon landing and while still aboard he was arrested. The district court never held a hearing with respect to Toscanino's allegations.
 
 
 11
 On the appeal from his conviction, we held that Toscanino had alleged a violation of due process which, if proved, would require the district court to divest itself of jurisdiction over him. Our opinion recognized the traditional rule, set forth in a line of cases from Ker v. Illinois, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886) to Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952), declaring that the manner in which a defendant was brought into the United States did not affect the court's power to proceed. The Ker-Frisbie doctrine was rooted in the perception that
 
 
 12
 due process of law is satisfied when one present in court is convicted of crime after being fairly apprised of the charges against him and after a fair trial in accordance with constitutional procedural safeguards.
 
 
 13
 Frisbie, 342 U.S. at 522, 72 S.Ct. at 512. Its effect was to render 'police brutality and lawlessness,' Toscanino, 500 F.2d at 272, involved in obtaining jurisdiction over the defendant almost wholly immune from judicial scrutiny.[3]
 
 
 14
 Toscanino viewed the Ker-Frisbie doctrine, however, as not preventing judicial scrutiny of conduct of the most outrageous and reprehensible kind by United States government agents, because of recent pronouncements by the Supreme Court in the area. Id. at 272--275. Any other approach, Toscanino declared, would be inconsistent with cases refusing to permit the government to benefit from illegal police conduct in obtaining evidence, id. at 272, citing Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), extracting confessions, id., citing Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1961), and inducing criminal conduct by the defendant, id., citing United States v. Russell, 411 U.S. 423, 430--431, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973).
 
 
 15
 Yet in recognizing that Ker and Frisbie no longer provided a carte blanche to government agents bringing defendants from abroad to the United States by the use of torture, brutality and similar outrageous conduct, we did not intend to suggest that any irregularity in the circumstances of a defendant's arrival in the jurisdiction would vitiate the proceedings of the criminal court. In holding that Ker and Frisbie must yield to the extent they were inconsistent with the Supreme Court's more recent pronouncements we scarcely could have meant to eviscerate the Ker-Frisbie rule, which the Supreme Court has never felt impelled to disavow.[4] Although we cited other cases in Toscanino as evidence of the partial erosion of Ker and Frisbie, the twin pillars of our holding were Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) and dictum in United States v. Russell, 411 U.S. at 431--432, 93 S.Ct. 1637, both of which dealt with government conduct of a most shocking and outrageous character. For example, in Rochin, which Toscanino described as an illustration of when the Frisbie rule would yield, an emetic solution was forced through a tube into a defendant's stomach to recover two morphine capsules which he had swallowed; the capsules were later introduced at his trial. We quoted at length from Justice Frankfurter's opinion reversing the conviction because the government conduct had been found to 'offend those canons of decency and fairness which express the notions of justice of English-speaking peoples,' to 'shock the conscience,' and to 'offend a 'sense of justice." 342 U.S. at 172--173, 72 S.Ct. at 209--210. Similarly, we cited Russell for the proposition that 'The force of Rochin continues to be recognized,' 500 F.2d at 274, and noted the Court's warning that
 
 
 16
 . . . we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction . . .. 411 U.S. at 431--432 93 S.Ct. at 1643.
 
 
 17
 The cruel, inhuman and outrageous treatment allegedly suffered by Toscanino brought his case within the Rochin principle[5] and demanded that we provide him a remedy. Since there was no 'fruit' of the abduction which could be suppressed other than the conviction which ensued, we concluded that the sole effective remedy was to order Toscanino's release if he proved his allegations. 500 F.2d at 275.
 
 
 18
 But the same cannot be said of Lujan. It requires little argument to show that the government conduct of which he complains pales by comparison with that alleged by Toscanino. Lacking from Lujan's petition is any allegation of that complex of shocking governmental conduct sufficient to convert an abduction which is simply illegal into one which sinks to a violation of due process. Unlike Toscanino, Lujan does not allege that a gun blow knocked him unconscious when he was first taken into captivity, nor does he claim that drugs were administered to subdue him for the flight to the United States. Neither is there any assertion that the United States Attorney was aware of his abduction, or of any interrogation. Indeed, Lujan disclaims any acts of torture, terror, or custodial interrogation of any kind.
 
 
 19
 In sum, but for the charge that the law was violated during the process of transporting him to the United States, Lujan charges no deprivation greater than that which he would have endured through lawful extradition. We scarcely intend to convey approval of illegal government conduct. But we are forced to recognize that, absent a set of incidents like that in Toscanino, not every violation by prosecution or police is so egregious that Rochin and its progeny requires nullification of the indictment.
 
 III.
 
 20
 Nor do we believe that Lujan's allegation that his abduction violated the charters of the United Nations and the Organization of American States makes Toscanino applicable to his case. In Toscanino we first emphasized that Ker and Frisbie had been undermined by recent due process precedents, and in addition had involved criminal prosecutions by state courts, thus barring the invocation of the federal judicial supervisory power. We further distinguished those cases, however, by noting that neither involved a violation of an international agreement to which the United States was a party. On this ground, too, we distinguished United States v. Sobell, 244 F.2d 520 (2d Cir.), cert. denied, 355 U.S. 873, 78 S.Ct. 120, 121, 2 L.Ed.2d 77 (1957). Sobell, Toscanino pointed out, based his claim solely on the extradition treaty with Mexico, and it was well-established that such treaties were not violated by the illegal abduction of a particular defendant.
 
 
 21
 We observed, however, that Toscanino's abduction violated the United Nations Charter, art. 2, para. 4,[6] and the charter of the Organization of American States, art. 17,[7] both of which proscribed use of force by one state against the territory of another. As evidence that abductions would contravene those provisions, Toscanino relied principally on the Eichmann incident, in which the U.N. Security Council, in response to a formal complaint filed by the United Nations representative from Argentina, found that Argentinian sovereignty was violated when Israeli and other 'volunteers' kidnapped the mass murderer from Argentina in order to bring him to justice. And, we suggested, a defendant might be able to interpose the violation of those charters as a defense to a criminal prosecution.
 
 
 22
 But unlike Toscanino, Lujan fails to allege that either Argentina or Bolivia in any way protested or even objected to his abduction.[8] This omission is fatal to his reliance upon the charters. The provisions in question are designed to protect the sovereignty of states, and it is plainly the offended states which must in the first instance determine whether a violation of sovereignty occurred, or requires redress. H. Kelsen, Principles of International Law 234 (Tucker ed. 1966); ALI, Restatement (Second) of the Foreign Relations Law of the United States § 1, comment f; § 163, comment d (1965). Indeed, even where a treaty provides certain benefits for nationals of a particular state--such as fishing rights--it is traditionally held that
 
 
 23
 any rights arising out of such provisions are, under international law, those of the states and . . . individual rights are only derivative through the states.
 
 
 24
 Id. § 115, comment e.
 
 
 25
 Thus, the failure of Bolivia or Argentina to object to Lujan's abduction would seem to preclude any violation of international law which might otherwise have occurred. As the comment to Article 16 of the Harvard Research in International Law Draft Extradition Treaty noted:
 
 
 26
 It only remains to be emphasized that by no means every irregularity in the recovery of a fugitive from criminal justice is a 'recourse to measures in violation of international law or international convention.' If the State in which the fugitive is found acquiesces or agrees, through its officers or agents, to a surrender accomplished even in the most informal and expeditious way, there is no element of illegality.
 
 
 27
 29 Am.J.Int'l Law Supp. 631 (1935). The Rule is no more than a particular application of the general principle that consent or acquiescence by the offended state waives any right it possessed, and heals any violation of international law. 1 G. Schwarzenberger, Manual of International Law 162 (4th ed. 1960).
 
 
 28
 This rule has been expressed in numerous cases. For example, in the Eichmann trial, to which we referred in Toscanino, the Supreme Court of Israel permitted the execution to proceed because Argentina, in a joint communique with Israel, had waived its objections and thereby cured any violation of international law. 6 M. Whiteman, Digest of International Law 1110 (1968). Similarly, the Permanent Court of Arbitration at the Hague declined to order the return to France of Savarkar, an Indian prisoner who had escaped to France from a British ship only to be turned over to British authorities by a member of the French gendarmerie. The Court of Arbitration held that the French official's act had vitiated any violation of French sovereignty which might otherwise have occurred. 2 G. Hackworth, Digest of International Law 319 (1941), citing I Scott, The Hague Court Reports 275 (1916). And in our recent decision in Fiocconi v. Attorney General of the United States, 462 F.2d 475 (2d Cir.), cert. denied, 409 U.S. 1059, 93 S.Ct. 552, 34 L.Ed.2d 511 (1972), we held that Italy's surrender of Fiocconi as a matter of 'comity' to permit him to stand trial in the District of Massachusetts did not prevent the United States from also trying him for an unrelated but similar offense in the Southern District of New York, since it was unlikely that Italy would regard the additional trial as a breach of the terms of the surrender. See also United States ex rel. Donnelly v. Mulligan, 76 F.2d 511 (2d Cir. 1935); Case of Wilson and McElvery, 4 J. Moore, Digest of International Law 329 (1906).
 
 
 29
 Indeed, we recognized in Toscanino that abduction from another country violates international law only when the offended state objects to the conduct. There, we distinguished United States v. Cotten, 471 F.2d 744 (9th Cir. 1973) as a case in which a forcible abduction violated no international law since the defendants had been voluntarily turned over to United States representatives by the Vietnamese authorities.
 
 
 30
 We do not have to decide here whether, in the absence of a claim of torture or of similar reprehensible conduct, the violation of international law alone would require dismissal of an indictment. We hold only that given Lujan's failure to allege that Argentina or Bolivia protested his abduction or that the abduction involved abuse of the type we condemned in Toscanino, there is no justification for ordering the district court to divest itself of jurisdiction over him.[9]
 
 Affirmed.[10]
 
 31
 ROBERT P. ANDERSON, Circuit Judge (concurring):
 
 
 32
 As Judge Kaufman has noted at the beginning of his opinion, the disposition of this case turns upon an interpretation of the holding of a panel of this court in United States v. Toscanino, 500 F.2d 267 (2 Cir. 1974). As a member of that panel I concurred in the result only, because I was of the opinion that the case could be disposed of on due process grounds alone, and I still adhere to that view. In the present case there is no claim of cruel, brutal and inhumane treatment of Lujan by agents of the United States in foreign countries as there was in Toscanino. Lujan was a citizen and resident of Argentina, that is to say, a foreign national who was not a fugitive from the United States. He was lured from Argentina to Bolivia, and was there abducted, forcibly put on a plane and brought to the United States where he was arrested and prosecuted in the United States District Court for the Eastern District of New York. The question is whether, solely in the light of due process considerations, the district court had jurisdiction over Lujan. The discussion in the majority opinion in Toscanino of the due process issue, as well as the mention of this court's supervisory power over the administration of criminal justice in this Circuit read, in my opinion, as if the kidnapping from his own country and the forcible delivery into the United States of a non-fugitive foreign national, standing alone, would be sufficient to deprive the district court of jurisdiction, Toscanino, 500 F.2d at pp. 274--276.
 
 
 33
 After Toscanino was decided, however, a motion was made for a hearing in banc. A majority of the active members of the court voted to deny the petition for a hearing in banc, three judges dissenting. In so doing the majority obviously interpreted the decision in Toscanino as resting solely and exclusively upon the use of torture and other cruel and inhumane treatment of Toscanino in effecting his kidnapping and it rejected the proposition that a kidnapping of a foreign national from his own or another nation and his forcible delivery into the United States against his will, but without torture, would itself violate due process. This interpretation of Toscanino has become the law of this Circuit. It has been similarly construed by another Circuit, United States v. Herrera, 504 F.2d 859 (5 Cir. 1974).
 
 
 34
 I, therefore, concur in the opinion in the present case. Judge Kaufman has correctly, it seems to me, noted and applied the thrust of the action of the majority of this court in denying an in banc hearing in Toscanino, to the effect that whenever a foreign national is abducted or kidnapped from outside of the United States and is forcibly brought into this Country by United States agents by means of torture, brutality or similar physical abuse the federal court acquires no jurisdiction over him because of a violation of due process. Otherwise the holdings of the Supreme Court in Ker v. Illinois, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886), and Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952), govern.
 
 
 
 [1]
 Two members of this panel also participated in Toscanino. Judge Oakes concurred in Judge Mansfield's majority opinion in that case, and Judge Anderson in a separate opinion concurred in the result
 
 
 [2]
 At the request of the government, which sought to have the parameters of Toscanino clarified, Judge Mishler first granted Lujan's motion to dismiss. The government filed notice of appeal on June 7, 1974. Subsequently, it withdrew its appeal and moved for reinstatement of the indictment. Judge Mishler then vacated his prior order dismissing the indictment, and on the same day dismissed Lujan's petition for habeas corpus
 
 
 [3]
 There were limited exceptions to the Ker-Frisbie rule. If the defendant was brought into the United States under an extradition treaty, the 'principle of specialty' decreed that he could be tried only for the crime for which he was extradited. United States v. Rauscher, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886) (decided on the same day as Ker). A similar result occurred when the United States had signed a treaty which imposed a territorial limitation on its own authority. Cook v. United States, 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641 (1933). In addition, those responsible for the abduction might under some circumstances be extradited for kidnapping, see, e.g., Villareal v. Hammond, 74 F.2d 503 (5th Cir. 1934); Collier v. Vaccaro, 51 F.2d 17 (4th Cir. 1931), and might be liable in a foreign court for civil damages as well
 
 
 [4]
 Indeed, the courts of other circuits have continued to adhere to the Ker-Frisbie rule. See, e.g., United States v. Herrera, 504 F.2d 859, (5th Cir. 1974); United States v. Vicars, 467 F.2d 452 (5th Cir. 1972), cert. denied, 410 U.S. 967, 93 S.Ct. 1451, 35 L.Ed.2d 702 (1973); United States ex rel. Calhoun v. Twomey, 454 F.2d 326 (7th Cir. 1971); United States v. Sherwood, 435 F.2d 867 (10th Cir. 1970), cert. denied, 402 U.S. 909, 91 S.Ct. 1381, 28 L.Ed.2d 649 (1971); Sewell v. United States, 406 F.2d 1289, 1292--1293 & n.2 (8th Cir. 1969); Brown v. Fogel, 387 F.2d 692, 696 n.7 (4th Cir. 1967); Tynan v. Eyman, 371 F.2d 764 (9th Cir. 1970), cert denied, 393 U.S. 954, 89 S.Ct. 383, 21 L.Ed.2d 366 (1968)
 
 
 [5]
 As the passage from Russell cited in the text indicates, the relevance of the Rochin principle is not that it provides a test which may easily be applied, see Irvine v. California, 347 U.S. 128, 74 S.Ct. 381, 98 L.Ed. 561 (1954), but that it embodies a perception which remains viable--a court which would ordinarily stay its hand will intervene when government conduct becomes so outrageous that conscience and justice demand a remedy
 
 
 [6]
 Article 2 paragraph 4 of the United Nations Charter provides:
 All Members shall refrain in their international relations from the threat or use of force against the territorial integrity or political independence of any state, or in any manner inconsistent with the Purposes of the United Nations. 59 Stat. 1035.
 
 
 [7]
 Article 17 of the charter of the Organization of American States provides:
 The territory of a State is inviolable; it may not be the object, even temporarily, of military occupation or of other measures of force taken by another State, directly or indirectly, on any grounds whatever. No territorial acquisitions or special advantages obtained either by force or by other means of coercion shall be recognized.
 
 
 [8]
 Toscanino, by contrast, alleged the following:
 In fact, the Uruguayan government claims that it had no prior knowledge of the kidnapping nor did it consent thereto and had indeed condemned this kind of apprehension as alien to its laws.
 500 F.2d at 270. We believe that to support this claim. Toscanino would have to prove that the Uruguayan government registered an official protest with the United States Department of State.
 
 
 [9]
 We note that Lujan was taken into custody only after an arrest warrant was issued. Since, therefore, there was probable cause for Lujan's arrest, and since the failure of Argentina or Bolivia to object suggests that they would have been receptive to Lujan's extradition, we decline to adopt in this case the extreme remedy of requiring dismissal of the indictment. For unlike the exclusionary rule which prohibits use of illegally obtained evidence or confessions, adoption of an exclusionary rule here would confer a total immunity to criminal prosecution. Moreover, the controls which otherwise exist to prevent illegal abductions--the financial cost of the operation, the possibility of alienating other nations, and the risk that the kidnappers would be prosecuted in a foreign territory for their offense--suggest that the likelihood of numerous violations is not real. If this assumption should, in the future, prove to be ill-founded, our conclusion can be reconsidered. See Mapp v. Ohio, 367 U.S. 643, 650--653, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) overruling Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949)
 
 
 [10]
 Because we held for other reasons that it does not control this case, we find it unnecessary to decide whether Toscanino should be given retroactive effect. The issues are, of course, interrelated, for whether a decision is retroactive depends in part on its rationale, the extent to which it overturned prior law, and the breadth of its effect. See Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). Accordingly, we were first required to consider the scope of the holding in Toscanino, and our views on that point, standing alone, require affirmance