**Juan Ramon MATTA–BALLESTEROS,
on the relation of Martin R.
STOLAR, his attorney, Petitioner,**

v.

**Gary L. HENMAN, Warden, United
States Penitentiary at Marion,
Illinois, Respondent.**

No. 88–3267.

United States District Court,
S.D. Illinois.

Aug. 16, 1988.

Martin R. Stolar, New York City, Michael D. Abzug, Los Angeles, Cal., Adolfo Z. Aguila, Miami, Fla., for petitioner.

John L. Kuray, Narcotic & Dangerous Drug Section, Dept. of Justice, Washington, D.C., Ralph M. Friederich, Asst. U.S. Atty., East St. Louis, Ill., for respondent.

## MEMORANDUM AND ORDER

STIEHL, District Judge:

Before the Court is Juan Ramon Matta–Ballesteros' (Matta) Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 by a Person in Federal Custody.

## I. INTRODUCTION

This cause is before the Court in a posture somewhat different from the majority of federal habeas actions which the Court is regularly required to review. The petitioner is not challenging the duration or nature of his confinement; rather, he challenges the legality of his detention. Petitioner asserts that he was illegally and unconstitutionally taken from his home in Honduras and removed to the United States by federal agents. The relief Matta seeks is to have this Court declare that the United States is without jurisdiction over petitioner due to alleged violations of his right to due process in the manner of his apprehension, and order that Matta be returned to Honduras.

Matta is under indictment in the Northern District of Florida for an alleged escape from the United States Prison Camp at Eglin Air Force Base in 1971, and faces indictments on various narcotics charges in the Central and Southern Districts of California, and the District of Arizona. Matta originally sought a temporary restraining order from this Court to prevent the government from transferring him from the United States Penitentiary at Marion, Illinois, where he is currently detained, to face prosecution in any other district. The Court, upon consent of the government, entered its temporary restraining order on April 25, 1988. The Court directed the parties to brief certain issues prior to the preliminary injunction hearing on May 16, 1988. On May 4, 1988, again upon consent of the government, and for good cause shown, the TRO was extended until May 16, 1988. The Court heard extensive oral argument on the application for preliminary injunction, including arguments on the likelihood of success on the merits of the underlying habeas corpus action. The government agreed to a further extension of the TRO until the Court's ruling on the application for preliminary injunction.

On May 25, 1988, the Court denied Matta's application for a preliminary injunction. The Court ruled that petitioner had failed to establish that he lacked an adequate remedy at law; that he failed to show irreparable harm; and that the balance of harms did not weigh in petitioner's favor. The Court made no ruling as to the likelihood of success on the merits. The merits of Matta's habeas petition are now before the Court.

On June 2, 1988, the Court directed the government to show cause why the writ should not issue, and on June 20, 1988, ordered an expanded record from the parties, including affidavits from the petitioner and any occurrence witnesses. The parties have complied with the Order, and the Court has before it the petition for a writ of habeas corpus, the affidavits of Matta, certain occurrence and other witnesses, and certain reports.

## II. BACKGROUND

### A. Uncontroverted Facts

The following is a description of the events surrounding the arrest which are uncontroverted:

Juan Ramon Matta–Ballesteros, a/k/a Juan Ramon Mata del Pozo, a/k/a Juan Ramon Mata, (Matta) is a resident of Tegucigalpa, Honduras. Very early on the morning of April 5, 1988, Matta, accompanied by two security guards/drivers, went a short distance from his home to the residence of his attorney, Carlos D. Lorenzana. His guards remained outside while he went into the house. Within minutes of arriving, Matta received a telephone call from his

wife. Matta exited his attorney's house to return to his home. Matta's security guards informed him that they had observed members of the military, described by one as the Honduras Special Troops known as "Cobra" watching the attorney's home while standing at either end of the street. Matta, accompanied by his security guards, drove the van back to his home.

Upon arriving at his home, Matta got out of the van and identified himself to members of the Honduran military. The van was surrounded by many military men with weapons. A beige Land Cruiser Toyota pickup truck pulled up and two men arrested Matta. Included among the group at Matta's house were some Americans in civilian clothing. Matta was grabbed, a brief struggle ensued, a black hood was placed over his head, and he was pushed onto the floor in the back seat of the Land Cruiser. At some point during the apprehension, Matta may have been shocked several times by a stun gun.

Deputy United States Marshal, Juan J. Donato Morales, drove the Land Cruiser to an air base, an hour to an hour and a half away. Sometime thereafter, Matta was placed on an airplane. He was subsequently flown to the United States, and then transferred to the United States Penitentiary at Marion, Illinois, in this District, early on the morning of April 6, 1988. Approximately 24 hours elapsed from the time of his apprehension to the time of his arrival at Marion Penitentiary.

Upon his arrival at Marion on April 6, 1988, Matta was given an initial medical examination. The examination revealed, in part, the following:

| Clinical Evaluation | Notes |
| --- | --- |
| 18. Head, Face, Neck and Scalp | Linear abrasions at left and posterior basal aspect of the neck |
| 34. G–U System | Presence of depigmented area with some scaling at the left side of proximal shaft of the penis |
| 35. Upper Extremities | Linear abrasions at the distal part of both forearms mostly at the lateral and posterior side. Palmar side of both hands are smeared light red (per pt's information it's from blood) |
| 36. Feet | Abrasion about 1⅓ × ½ cm at dorsum of left foot |
| 39. Identifying Body Marks, Scars, Tattoos | Multiple erythematous spots of about 3–5 mm at the back. Few of these spots have denuded skin compatible with ruptured blister |

### B. Controverted Facts

The expanded record reveals the following questions of fact exist:

1. Petitioner asserts that a large group of United States agents were present at Matta's home. The government asserts that there were only four members of the United States Marshals Service near Matta's residence.

2. Petitioner asserts that he was seized by American "agents" in civilian clothing. The government asserts that the apprehension was made by Honduran officers, and that no United States agents were involved in the struggle with Matta.

3. Matta claims that the American agents, during the one and one half hour drive to the air base, beat him on the head, back and arms and burned him with a "double pronged electric." He further claims that they mixed their shocks with "shouted interrogation," in both English and Spanish (with non-Honduran accents). The government, through the affidavit of Deputy Marshal Donato Morales, asserts that Honduran officers placed Matta on the floor of the Land Cruiser, that one Honduran rode in the back seat with Matta, and the other with Donato Morales in the front. Donato Morales observed the officer in the front to carry a stun gun device which was placed on the floor. He did not see Matta receive shocks from the stun gun during the trip.

4. Matta claims that upon arrival at the air base he was placed aboard a jet and flown to the United States. The government asserts that Matta remained at the air base in an air conditioned vehicle for two to two and one half hours while awaiting an airplane.

5. Matta claims that during the two hour flight, the hood remained on his head and he was repeatedly beaten and shocked about the body, including his testicles and

feet. He claims that upon arrival in the United States he was flown aboard a commercial jet to Puerto Rico and was forced to sign an Entry Declaration, and was advised that he was under arrest. The government denies that Matta was beaten or shocked during the trip to the United States, denies that he was flown from the United States to Puerto Rico, and denies that Matta was forced to sign an entry declaration.

## III. APPLICATION OF LAW

Petitioner has asked this Court to issue a writ of habeas corpus and declare that no court in the United States has jurisdiction over Matta, and to order his return to Honduras. Petitioner asserts two grounds entitling him to the relief he seeks: First, that the apprehension of Matta violated the Honduran Constitution, which prohibits extradition of Honduran citizens, the 1909 Extradition Treaty between the United States and Honduras, and the Inter–American Extradition Treaty of 1933, to which the United States and Honduras are signatories; Second, that Matta's Fifth Amendment right to due process was violated when he was tortured and abducted from Honduras. Both grounds present questions of jurisdiction and standing.

### A. Standard of Review

The government asks this Court to determine that, as a matter of law, petitioner is not entitled to the relief he seeks. Under Rule 8(a) of the Rules Governing Habeas Corpus cases under Section 2254, 28 U.S.C. foll. § 2254, the Court may determine, upon review of the expanded record, whether an evidentiary hearing is required. "If it appears that an evidentiary hearing is not required, the judge shall make such disposition of the petition as justice shall require." The review, therefore, is in the nature of the review the Court makes when considering a motion for summary judgment.

In *Jeter v. Keohane*, 739 F.2d 257 (7th Cir.1984), the court stated, "an evidentiary hearing is not necessary when the facts essential to consideration of the constitutional issues are already before the court.

*Bergenthal v. Cady*, 466 F.2d 635, 648 (7th Cir.1972), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 913, 34 L.Ed.2d 690 (1973); 28 U.S.C. § 2243." 739 F.2d 257, n. 1.

The Court must determine if petitioner has presented sufficient allegations to entitle him to the habeas relief he seeks as a matter of law. The Court will, therefore, consider the pleadings and the affidavits in the light most favorable to the petitioner. Petitioner must raise a question of material fact to entitle him to habeas review; that is, his allegations must be outcome-determinative under the applicable law.

### B. Violation of Extradition Treaties

Matta asserts that his capture violated the Honduran Constitution, and at least two extradition treaties to which the United States and Honduras are signatories.

■ The well-recognized rule of international law is that "only sovereign nations have the authority to complain about violations of extradition treaties." *United States v. Yunis*, 681 F.Supp. 909, 916 (D.D.C.1988). Similarly, "[E]xtradition treaties are made for the benefit of the governments concerned.... And, under international law, it is the contracting foreign government, not the defendant, that would have the right to complain about a violation." *United States v. Cordero*, 668 F.2d 32, 37–38 (1st Cir.1981), *quoted in Yunis*, 681 F.2d at 916. *See also, United States v. Valot*, 625 F.2d 308 (9th Cir.1980); *United States ex rel. Lujan v. Gengler*, 510 F.2d 62, 67–68 (2d Cir.), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975). Further:

> Indeed, even where a treaty provides certain benefits for nationals of a particular state ... it is traditionally held that "any rights arising out of such provisions are, under international law, those of the states and ... individual rights are only derivative through the states."

*Lujan*, 510 F.2d at 67, *quoting ALI, Restatement (Second) of the Foreign Relations Law of the United States*, § 115, comment (e) (1965). Therefore, absent an objection by Honduras as to Matta's capture, he is precluded from personally as-

serting that a violation of any extradition treaty has occurred, whether it be that between the United States and Honduras, or the Inter–American Extradition Treaty.

It only remains to be emphasized that by no means every irregularity in the recovery of a fugitive from criminal justice is a "recourse to measures in violation of international law or international convention." If the State in which the fugitive is found acquiesces or agrees, through its officers or agents, to a surrender accomplished even in the most informal and expeditious way, there is no element of illegality.

Comment to Article 16, Harvard Research in International Law Draft Extradition Treaty, 29 Am.Jur.Int'l Law Supp. 631 (1935); *quoted in Lujan*, 510 F.2d at 67.

As the Second Circuit in *Lujan* noted, in reference to *United States v. Toscanino*, 500 F.2d 267 (2d Cir.) *pet. for reh'g en banc denied*, 504 F.2d 1380 (2d Cir.1974), "[T]o support this claim [of a violation of an extradition treaty], Toscanino would have to prove that the Uruguayan government registered an official protest with the United States Department of State." 510 F.2d at 67, n. 8.

In support of his claim, Matta has included in the expanded record an affidavit of Felix Cerna Salgado, a member of the National Congress of the Republic of Honduras for the Department of Olancho. His affidavit states that the apprehension of Matta "has been repudiated by the majority of the Honduran people and especially by public officers of the legislative, judiciary, and executive powers of the Republic...." He further states that Matta's apprehension provoked public demonstrations and an attack on the American Embassy, and that five Honduran citizens were killed, six million dollars in property was damaged and a state of national emergency was declared. The affidavit includes an extensive list of public officials and professional organizations that protested the apprehension. However, notably absent is any reference to an official protest having been made by the Honduran government, Foreign Ministry, or President.

Similarly, the "Declaration" submitted by the petitioner, is a declaration, or bill, merely submitted to the National Congress by seven congressmen. It is of no official weight, the record does not reflect that it has even been voted on, or approved by the congress, and there is no indication that its sentiments have been adopted by the executive branch of the government.

Absent the fact of an official protest, petitioner is without standing to assert the violation of any extradition treaty as grounds for the relief he seeks.

■ To the extent that Matta's claim is based on the Honduran Constitution, this Court is clearly without jurisdiction to interpret or apply it to proceedings before the Court. Furthermore, the failure of the Honduran government to object to Matta's apprehension similarly prevents him from asserting an infringement of the Honduran Constitution as grounds for the relief he seeks.

### C. Violations of Petitioner's Fifth Amendment Rights

1. Application of the United States Constitution to Aliens.

■ Petitioner claims that his forcible abduction and transportation from Honduras to the United States violated his right to due process. The Supreme Court has not resolved the question of whether the Constitution of the United States affords its protection to aliens. The Court has, however, held that the Constitution is in force "wherever and whenever the sovereign power of [the United States] is exerted." *Balzac v. Porto Rico*, 258 U.S. 298, 312, 42 S.Ct. 343, 348, 66 L.Ed. 627 (1922). Most circuits have applied the Constitution to situations where the government acts extraterritorially, requiring those acts "to conform to constitutional proscriptions when acting overseas." *Yunis*, 681 F.Supp. 917 (citations omitted). This Court is similarly persuaded, and finds that Matta is entitled to the guarantees and protections of the Constitution as it applies to the activities of government officials in Matta's capture and transportation from Honduras to the United States.

2. Whether the circumstances and nature of Matta's capture violated his Fifth Amendment Rights.

 The long-standing rule of law is that a forcible abduction does not offend due process nor does it require that courts dismiss an indictment for loss of jurisdiction on those grounds. The Seventh Circuit, in *United States v. Marzano*, 537 F.2d 257 (7th Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1977), stated:

> It has long been held that due process has been satisfied when a person is apprised of the charges against him and is given a fair trial. The power of a court to try a person is not affected by the impropriety of the method used to bring the defendant under the jurisdiction of the court.

*Id.* at 271, *citing Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886).

The *Ker–Frisbie* doctrine, as it has come to be known, stands for the premise that the "forcible abduction of a criminal defendant into the court's jurisdiction does not impair the court's power to try him." *United States v. Cordero*, 668 F.2d 32, 36 (1st Cir.1981). This doctrine has been reaffirmed by the Supreme Court in *United States v. Crews*, 445 U.S. 463, 474, 100 S.Ct. 1244, 1251, 63 L.Ed.2d 537 (1980); *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed. 2d 54 (1975). (In which the Supreme Court stated "Nor do we retreat from the established rule that illegal arrest or detention does not void a subsequent conviction." *Id.* at 119, 95 S.Ct. 865.)

 The petitioner is not under indictment in this district. This fact places petitioner's claim in a unique position before the Court. Petitioner seeks relief from this Court which, if granted, would result in his return to Honduras, and, therefore, affect the personal jurisdiction of those courts in which he faces indictment. Under the *Ker–Frisbie* doctrine, courts are not required to dismiss an indictment for lack of jurisdiction based on the defendant's forc-

ible abduction. To the extent that this is a case of first impression, the Court holds that the *Ker–Frisbie* doctrine applies to alleged escapees who seek habeas relief based on the "impropriety of the method" used to bring the petitioner within the jurisdiction of the Court. 537 F.2d at 271. To that extent, the Court finds that no Fifth Amendment violation occurred that would warrant the relief Matta seeks.

3. The *Toscanino* Exception.

The petitioner would have this Court apply an exception to the *Ker Frisbie* doctrine pursuant to the Second Circuit ruling in *United States v. Toscanino*, 500 F.2d 267 (2d Cir.1974). The Court first notes that the Seventh Circuit has yet to apply the *Toscanino* exception to any case before it, nor has the Seventh Circuit indicated any intent to limit the *Ker–Frisbie* doctrine. This Court does not believe that *Toscanino* should be applied to Matta's habeas petition to afford him the extraordinary relief, return to Honduras, which he seeks. To date, the *Toscanino* argument, or one similar, has been rejected by the Fifth, Ninth, Tenth, and Eleventh Circuits. *See: United States v. Postal*, 589 F.2d 862 (5th Cir.), *cert. denied*, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979); *United States v. Winter*, 509 F.2d 975 (5th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975); *United States v. Herrera*, 504 F.2d 859 (5th Cir.1974); *United States v. Cotten*, 471 F.2d 744 (9th Cir.), *cert. denied*, 411 U.S. 936, 93 S.Ct. 1913, 36 L.Ed.2d 396 (1973); *Hobson v. Crouse*, 332 F.2d 561 (10th Cir.1964); *United States v. Rosenthal*, 793 F.2d 1214 (11th Cir.1986), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987). And no court applying *Toscanino* has dismissed an indictment. In *Marzano*, 537 F.2d at 272, the Seventh Circuit found: "No facts have been alleged or proved which could be termed shocking to the conscience. *Toscanino* is therefore inapposite. We need not decide whether we would follow *Toscanino* if similar facts were presented."

In *Toscanino*, the Second Circuit, determined that the *Ker–Frisbie* doctrine was

weakened by the Supreme Court's ruling in *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (where the court set aside a conviction based on evidence that had been obtained by pumping the defendant's stomach, against his will). The *Toscanino* court stated:

Faced with a conflict between the two concepts of due process, the one being the restricted version found in *Ker–Frisbie* and the other the expanded and enlightened interpretation expressed in more recent decisions of the Supreme Court, we are persuaded that to the extent that the two are in conflict, the *Ker–Frisbie* version must yield. Accordingly we view due process as now requiring a court to divest itself of jurisdiction over the person of a defendant where it has been acquired as the result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights.

500 F.2d at 275. The allegations were as follows: Toscanino was a citizen of Italy who was lured from his home in Uruguay by a telephone call from a co-conspirator. Toscanino was knocked unconscious with a gun, thrown into the rear seat of a car, bound and blindfolded and driven to the Uruguayan–Brazilian border. He was denied food, water and sleep and was "incessantly tortured and interrogated" for seventeen days. He was forced to walk a hallway for seven or eight hours, and was kicked and beaten. His fingers were pinched with metal pliers, alcohol was flushed in his eyes, and other fluids were forced into his body cavities. He received electric shocks to his ears, toes and genitals. He alleged that agents of the United States Department of Justice, Bureau of Narcotics and Dangerous Drugs were present at some of the torture and participated in portions of the interrogation. *Id.* at 269–70.

The Second Circuit remanded the case to the District Court which denied the motion to dismiss, ruling that there was no claim of participation by United States agents in Toscanino's abduction and torture. 398 F.Supp. 916, 917 (E.D.N.Y.1975). Therefore, the *Toscanino* exception requires that

both conditions be met for the court to be divested of jurisdiction. The first is that there must be government participation, and the second is that the government agents' conduct must rise to a level that shocks the conscience of the Court.

The Second Circuit, shortly after *Toscanino,* narrowed its holding, and recognized the vitality of the *Ker–Frisbie* doctrine. In *Lujan v. Gengler,* 510 F.2d 62, the Second Circuit stated:

Yet in recognizing that *Ker* and *Frisbie* no longer provided a carte blanche to government agents bringing defendants from abroad to the United States by the use of torture, brutality and similar outrageous conduct, we did not intend to suggest that any irregularity in the circumstances of the defendant's arrival in the jurisdiction would vitiate the proceedings of the criminal court.

*Id.* at 65 (emphasis supplied). Further:

We scarcely intend to convey approval of illegal government conduct. But we are forced to recognize that, absent a set of incidents like that in *Toscanino,* not every violation by prosecution or police is so egregious that *Rochin* and its progeny requires nullification of the indictment.

*Id.* at 66. Therefore, even the circuit that developed the *Toscanino* exception has refused to apply it generally, absent activity that "shocks the conscience."

█ Even if the *Toscanino* exception were to be applied in the Seventh Circuit, the Court finds that, as a matter of law, the allegations of petitioner do not rise to the threshold standard of *Toscanino.* The allegations of torture do not meet the required level of outrageousness, nor do they shock the conscience to the extent that they would require the Court to afford Matta the relief he seeks, thereby divesting each court under which he is indicted of its jurisdiction over him. *Rosenthal,* 793 F.2d at 1232.

The Court again stresses that Matta is an alleged escapee, under indictment for escaping federal custody. The indictment charging Matta with escape was returned

in the Northern District of Florida on December 10, 1986. The Court is unaware of any case applying *Toscanino* to dismiss an indictment or grant habeas relief where an alleged escapee has been returned to the jurisdiction of the court. Furthermore, the Second Circuit, in *United States v. Reed*, 639 F.2d 896 (2d Cir.1981), drew a distinction between the re-capture of a fugitive from justice and the initial capture of a defendant.

> It should also be noted that the agents' conduct would have been legal had it occurred anywhere in the United States or in any country where the United States exercises extraterritorial jurisdiction; *see* 18 U.S.C. § 3041–3042, for Reed, unlike the defendant in *Toscanino*, was a fugitive from justice who had jumped bail, who was the subject of a bench warrant, and who had been sought for some weeks.... We do believe, however, that this case is different from one in which jurisdiction is *initially* obtained by illegal means.

*Id.* at 904 n. 2 (emphasis added). The *Toscanino* exception is limited, and does not apply to fugitives brought back to the United States to face the charges against them. Therefore, not only do the allegations of torture fail to rise to the level of *Toscanino*, but petitioner is an alleged escapee who is not entitled to review under the *Toscanino* exception. *Id.*

Although, for purposes of review, the Court has construed the petition in the light most favorable to the petitioner, certain allegations are less than credible. Under Fed.R.Civ.P. 56(e), affidavits must be "made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

The Court first notes that parts of Matta's affidavit are less than credible due to his admission that he had a black hood placed over his head throughout the apprehension and drive to the air base. For example, Matta's affidavit states that "one of the agents was seen to carry a briefcase into the house and he knew that they opened it, removed a plastic bag containing a white powder and threw it on the floor," a statement which is not made on his own knowledge. Matta, by his own admission, had a black hood over his head at the time this incident occurred. Similarly, his affidavit states that he was given electric shocks by United States agents, again these incidents occurred while his head was covered. He does not aver that he could see through the hood, nor that the hood was, at anytime, removed from his head prior to his arrival in the United States.

Even if the Court were to accept all of Matta's allegations as true and disregard the affidavits and reports of the government, the treatment he received, even if solely at the hands of United States agents, clearly does not rise to the level of the "set of incidents" alleged in *Toscanino*. Moreover, the medical report of April 6, 1988 fails to support Matta's allegations of torture. Although the Court acknowledges that there is some medical evidence to support Matta's claim that he received shocks from a stun gun, his abrasions were medically classified as "compatible with a ruptured blister." By his own affidavit, Matta's return to the United States took little more than 24 hours. Clearly, his treatment did not rise to the level of torture described in *Toscanino*.

Therefore, the Court, under *Toscanino* would not be required to order Matta returned to Honduras as there has not been an "unreasonable invasion of [Matta's] constitutional rights." *Toscanino*, 500 F.2d at 275. The Court notes that a similar decision was reached by the United States District Court for the Northern District of Florida in a related case. *United States v. Matta–Ballesteros*, 700 F.Supp. 528 (N.D. Fla.1988). The Court denied Matta's Motion to Dismiss the Indictment, which was also based on the *Toscanino* exception. The court ruled:

> I conclude that the *Toscanino* rationale should not apply under the facts of this case. First, ... the Supreme Court has implicitly rejected *Toscanino* in decisions subsequent to 1974 which have reaffirmed the *Ker–Frisbie* doctrine.

. . . .

[E]ven if *Toscanino* represented the law, the facts alleged in this case by the defendant do not establish the kind of cruel, barbaric, and outrageous conduct by United States officials needed for the application of the substantive due process prong of the rule.

*Id.* at p. 531.

Under the law, therefore, the Court finds that petitioner's claim fails to raise any issues that would entitle him to an evidentiary hearing. The allegations of the petition, the affidavits and reports, considered in the light most favorable to Matta, conclusively establish that Matta is not entitled to habeas corpus relief. The factual allegations, as a whole, do not allege circumstances of a kind that would require this Court to authorize further discovery or order an evidentiary hearing. *Cf. Machibroda v. United States*, 368 U.S. 487, 494–95, 82 S.Ct. 510, 513–14, 7 L.Ed.2d 473 (1962).

While Matta is entitled to all of the substantive and procedural protections of the Constitution that are afforded to all criminals facing trial in the United States, the Court finds that the record shows that no grounds exist which would entitle petitioner to a writ of habeas corpus from this Court. Accordingly, the Court DENIES Matta's petition for a writ of habeas corpus, and finds that as a matter of law no hearing is required. This cause of action is hereby DISMISSED.

IT IS SO ORDERED.