**UNITED STATES of America, Plaintiff,**

v.

**Jairo TRUJILLO, Defendant.**

**Crim. A. No. 87–52–LON.**

United States District Court,
D. Delaware.

Dec. 16, 1994.

**216**

Edmond Falgowski, U.S. Atty.'s Office, Wilmington, DE, for plaintiff.

Christopher S. Koyste, Federal Public Defender's Office, Wilmington, DE, for defendant.

## OPINION

LONGOBARDI, Chief Judge.

### I. NATURE AND STAGE OF THE PROCEEDINGS

Before the Court is Defendant Jairo Trujillo's Motion for Repatriation to his native country of Columbia. [Docket Item ("D.I.") 58]. Defendant contends that repatriation is appropriate because the United States lacks personal jurisdiction over him. The Motion has now been fully briefed by both parties.

### II. ARGUMENTS OF THE PARTIES

Defendant submits the following allegations in support of his Motion to Repatriate. According to Defendant, on or about June 29, 1994, he was seized in London, England by English police officials because he had obtained employment in England without authorization. (D.I. 58, ¶ 1). Defendant asserts that upon his seizure, the English police officials learned from a contact with Interpol that an individual named Jairo Trujillo was wanted in the United States for an alleged drug offense. (D.I. 58, ¶ 2). The English police officers and/or Interpol officials contacted the United States Department of Justice in reference to Defendant's seizure; however, according to Defendant, no steps were taken by the United States to institute extradition proceedings to acquire jurisdiction over him. (D.I. 58, ¶ 2).

Defendant asserts that he was to be deported from England to his native country of Columbia on or about June 30, 1994. (D.I. 58, ¶ 3). Instead, however, Defendant contends that English officials put him on a plane to Miami, Florida and that United States officials were aware of and/or arranged to meet Defendant upon his arrival in Florida. When Defendant arrived in Miami, he was arrested by agents of the United States in relation to his outstanding Indictment in the District of Delaware.

Based upon the foregoing allegations, Defendant contends that the United States does not have jurisdiction over him and, furthermore, the United States' failure to extradite him from England bars the United States from now asserting jurisdiction. (D.I. 58, ¶ 4). Defendant contends that, even if the United States' failure to extradite him from England does not act as a bar to the United States' acquiring jurisdiction now, the United States still lacks jurisdiction because Defendant was brought into the United States as a result of: 1) misconduct by United States officials; 2) the unlawful attempt by United States officials to sidestep International laws and treaties regarding extradition to the United States; and 3) England's violation of International laws or treaties that occurred at the request or "implicit urging" of officials of the United States. (D.I. 58, ¶ 5). As an alternative basis for lack of jurisdiction, Defendant asserts that the United States cannot acquire jurisdiction over him because his presence was obtained in violation of England's extradition treaty with the United States, or, as yet another alternative, because he was obtained in violation of England's extradition treaty with Columbia. (D.I. 58, ¶¶ 6, 7). Defendant thus requests this Court to order his repatriation to his native country of Columbia.

The Government's version of the events leading up to Defendant's arrest in Miami, Florida is somewhat at odds with Defendant's version. It contends that on June 22, 1987, approximately one month after his arrest and indictment in the District of Delaware, Defendant Trujillo jumped bail. (D.I. 76, at 2). An arrest warrant then issued; the warrant was listed with the National Crimes Information Center ("NCIC") by the United States Marshals Service. According to the Government, as of October 1989, Defendant remained a fugitive, and the U.S.

Marshals Service requested the assistance of Interpol in locating and arresting Defendant. As of December 1993, Defendant remained a fugitive, and the U.S. Marshals Service inquired of Assistant United States Attorney ("AUSA") Edmond Falgowski as to whether the U.S. Attorney's Office would seek Defendant's extradition if he were to be arrested in a foreign country. According to AUSA Falgowski, he responded that extradition from a foreign country would not be sought, but that the warrant should remain on NCIC so as to facilitate Defendant's arrest if he ever returned to the United States. (D.I. 76, at 2–3).

The Government asserts that, unknown to any agency of the United States, on March 17, 1994, Defendant was admitted to the United Kingdom by Her Majesty's Immigration Service and granted visitor status with an employment prohibition. (D.I. 76, at 3). The Government asserts further that, by April 1994, United Kingdom Immigration Inspector Tony Marchant became aware of Defendant's NCIC arrest warrant, and subsequently contacted Gene Blahato, a DEA Special Agent who was on assignment at the American Embassy in London. Agent Blahato avers that Inspector Marchant inquired of him as to whether the arrest warrant for Trujillo that was listed with Interpol remained outstanding, and whether the United States would seek extradition of Trujillo from the United Kingdom. (D.I. 76, Attachment 2, Blahato Aff., ¶ 2). According to Agent Blahato, he then contacted the U.S. Marshals Service, which was responsible for the warrant, and was advised that the warrant remained outstanding, but that extradition from the United Kingdom to the United States was not authorized. (D.I. 76, Attachment 2, Blahato Aff., ¶ 3). Agent Blahato then relayed this information to Inspector Marchant.

Consistent with Agent Blahato's averments, AUSA Falgowski indicates that, sometime around April 1994, he was contacted by the U.S. Marshals Service with regard to the inquiries of UK Immigration Inspector Marchant. (D.I. 76, at 3). AUSA Falgowski asserts that he advised the U.S. Marshals Service that, because of the amount of drugs involved, four ounces, the Government would not seek the extradition of Trujillo, but that the arrest warrant should remain on NCIC. (D.I. 76, at 3). According to the Government, the U.S. Marshals Service then relayed this message to DEA Agent Blahato, who then relayed the message to Inspector Marchant.

Thereafter, on June 3, 1994, Defendant was arrested by UK Immigration officials and informed of their intent to deport him because he had secured employment within the United Kingdom, in violation of the conditions of his entry. (D.I. 76, at 3–4). The Government contends that Defendant was detained in London, where he was advised of his two options: 1) he could attend his deportation hearing, or 2) he could waive his right to a hearing and be removed from the United Kingdom to Columbia at the earliest practical opportunity. (D.I. 76, at 4). According to the Government, on June 14, 1994, Defendant chose to waive a hearing and leave the United Kingdom voluntarily.[1]

The Government alleges that on June 28, 1994, a Spanish speaking officer of the United Kingdom Immigration Service, Mr. Jeff Thomas, informed Defendant that his departure from London had been arranged for the first available flight from London to Bogota. (D.I. 76, at 4; Attachment 1, at 2). Further, according to the Government, Mr. Thomas explained to Defendant that the first available flight was on June 30, 1994, and had a connection in Miami; the first non-stop flight from London to Bogota was not available until after July 22, 1994. According to Inspector McCormack, upon whose assertions the Government relies, Defendant Trujillo chose to keep the reservation for the flight on June 30, 1994. (*See* D.I. 76, Attachment 1, Letter of A. McCormack, HM Inspector,

---

1. The Government's contentions are based upon the September 20, 1994 letter from Inspector McCormack of the UK Immigration Service, which is attached to the Government's Memorandum as Attachment 1. In the letter, Inspector McCormack describes the procedures used by the Immigration Service that led to Defendant's removal from the United Kingdom through Miami on June 30, 1994. (D.I. 76, Attachment 1).

United Kingdom Immigration Service, September 20, 1994).

The Government asserts that, pursuant to normal procedures, United Kingdom Immigration officials contacted the United States and provided notice of the persons who would be travelling through its territory: Trujillo and his two escorts. According to the affidavit of DEA Agent Scott Adams, the information regarding the specific details of Trujillo's flight was relayed to him in London by Inspector Marchant sometime in June 1994; Agent Adams then relayed the information to the U.S. Marshals Service in the District of Delaware. (D.I. 76, Attachment 3, Adams Aff., ¶ 2). According to the Government, the Marshals Service then relayed the information to AUSA Falgowski and inquired as to whether Defendant should be arrested in Miami before the connecting flight to Bogota departed. AUSA Falgowski responded affirmatively.

On June 30, 1994, Defendant was arrested in Miami prior to the departure of his connecting flight to Bogota. (D.I. 76, at 5). He was later removed to the District of Delaware for prosecution on the Indictment that had been outstanding since 1987.

AUSA Falgowski states that, to the best of his knowledge,

> all contacts in this matter between UK Immigration and the United States were made through the two DEA agents assigned to the American Embassy in London. At no time did either of the agents make a request, express or implied, of UK Immigration that Jairo Trujillo be deported or routed through the United States in conjunction with his voluntary departure from the United Kingdom.
>
> In summary, the United Kingdom unilaterally decided its deportation policies regarding Trujillo and the means by which those policies would be executed. No agents of the United States in any manner sought to influence those policies.

(D.I. 76, at 5). Further, Agent Blahato and Agent Adams each aver that they did not ever request the United Kingdom Immigra-

tion Office, either expressly or impliedly, to route Trujillo through the United States in conjunction with his removal from the United Kingdom. (D.I. 76, Attachments 2, 3; Blahato Aff., ¶ 4; Adams Aff. ¶ 3). Both Agents also aver that they have no knowledge of any such request having been made by the DEA or by any other agency of the United States. In addition, UK Immigration Inspector McCormack indicates in his letter that:

> at no time in our handling of Mr. Trujillo's arrest, detention and subsequent removal from the United Kingdom did this office do other than observe normal protocol when seeking to ensure that an immigration offender was acceptable in transit through a third country when travelling from the United Kingdom to his/her own country or to another country where he/she was assured of entry.

(D.I. 76, Attachment 1, at 2).

In reply to the Government's memorandum, Defendant asserts that the September 20, 1994 letter of HM Inspector McCormack that is attached to the Government's memorandum "contains inaccuracies concerning deportation procedures, and airline flight availability for travel between London, England and Bogota, Columbia."[2] (D.I. 77, at 1). Specifically, Defendant points to the Government's assertion that there were no direct flights available from London to Bogota until after July 22, 1994. Defendant contends that, in contrast to this assertion, numerous flights were available between London and Bogota during that time period. (D.I. 77, at 2; Exh. A). According to Defendant, British Airways flies from London to Bogota on the morning of every Friday and Sunday of each week. Defendant therefore contends that, because July 1, 1994 was a Friday, Defendant could have departed from the United Kingdom via British Airways on that date, or on July 3rd, 8th, 10th, 15th, or 17th. Defendant was not informed, however, as to these options.

Defendant also asserts that "the United States does not explain the apparent contradiction of its decision to not extradite Mr. Trujillo in light of the fact that he was ac-

---

2. Defendant fails to identify any of the "inaccuracies concerning deportation procedures" that are allegedly contained in Inspector McCormack's letter.

cused of possessing only four ounces of cocaine." (D.I. 77, at 2). According to Defendant, the Government's conduct in failing to extradite Defendant in the first instance, and then seizing him upon his arrival in Miami, demonstrates both that the Government did not want to expend the effort to extradite him, and that the Government "had a motive to entice England to send Mr. Trujillo to the United States, rather than Bogota, Columbia as Mr. Trujillo desired." (D.I. 77, at 2).

In rebuttal to Defendant's assertions, the Government asserts that Inspector Marchant had informed AUSA Falgowski that there were indeed direct flights scheduled from London to Bogota prior to July 22, 1994; however, all seats were booked on those flights, and the first direct flight for which a reservation could be made for Defendant was after July 22, 1994. (D.I. 78, at 1). With regard to Defendant's assertion that the Government fails to explain the apparent contradiction between its decision not to extradite Trujillo and its subsequent seizure of him in Miami, the Government asserts that the news of Trujillo's connecting flight in Miami was unexpected and "came as a complete surprise" to AUSA Falgowski, who indicates that the thought of such a connecting flight had "never crossed [his] mind." (D.I. 78, at 2).

### III. *DISCUSSION*

#### A. *Doctrine of Specialty*

■ Defendant's first contention in support of his Motion to Repatriate is that this Court lacks jurisdiction over him because of the Doctrine of Specialty. (D.I. 74, at 1–2). The Doctrine of Specialty is defined as follows:

> As a creature of international law, the specialty doctrine forbids the requesting country from prosecuting an extradited defendant for more than it set out in its extradition request. "The doctrine of 'specialty' prohibits the requesting nation from prosecuting the extradited individual for any offense other than that for which the surrendering country agreed to extradite."

*United States v. Abello–Silva,* 948 F.2d 1168, 1173 (10th Cir.1991) (quoting *United States v. Cuevas,* 847 F.2d 1417, 1426 (9th Cir.1988), *cert. denied,* 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989)), *cert. denied,* —— U.S. ——, 113 S.Ct. 107, 121 L.Ed.2d 65 (1992).

■ It seems clear to the Court that the Doctrine of Specialty applies to *extradited* individuals. In this case, Trujillo was not extradited. Moreover, the letter of Inspector McCormack indicates that Defendant *voluntarily* waived his right to a deportation hearing and chose to be removed from the United Kingdom at the earliest practical opportunity.[3] Thus, it appears to the Court that Defendant was not extradited, and the Doctrine of Specialty, therefore, has no application here.

■ Defendant contends, however, that the procedures used to remove him from the United Kingdom were arranged at the request of United States officials to avoid the lengthy extradition process and, therefore, "should be considered a de facto extradition which would give rise to the protections associated with the doctrine of specialty." (D.I. 74, at 1–2). The Court disagrees. First, the Government has provided the Court with the sworn affidavits of Agents Blahato and Adams indicating that neither they, nor to the best of their knowledge any other United States agency, made any request of the UK Immigration office, either expressly or impliedly, to route Trujillo through the United States in connection with his removal to Columbia. Against these sworn affidavits of United States officials are Defendant's bare, unsupported allegations of misconduct.

Second, even if Defendant's allegation, that United States officials arranged his stop-over in Florida so as to avoid the lengthy extradition process, is true, the Doctrine of Specialty would not apply. As stated above, the Doctrine of Specialty applies to individuals who have been *extradited.* Although Defendant concedes this point, he requests this Court to consider the procedures that were used to obtain his presence in the United

---

**3.** Although Defendant generally "disputes the United States' factual contentions", Defendant does not specifically deny Inspector McCormack's assertion.

States as a "de facto extradition" and to hold that the Doctrine of Specialty has, therefore, been violated because there was no formal extradition request identifying the charges for which Trujillo would be tried. (D.I. 74, at 2).

In *United States v. Alvarez–Machain,* ⸺ U.S. ⸺, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992), the United States Supreme Court held that the forcible abduction of a Mexican national from Mexico by United States officials did not deprive the United States of jurisdiction to try him for his violations of the criminal laws of the United States. In reaching this conclusion, the Court focussed on the Extradition Treaty that existed between the United States and Mexico and sought to determine whether the forcible abduction constituted a violation of its terms. To this end, the Court examined its decision in *United States v. Rauscher,* 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886), in which it had confronted the issue of whether a treaty between the United States and England prohibited the prosecution of the defendant for a crime other than that for which he had been extradited. *Alvarez–Machain,* ⸺ U.S. at ⸺, 112 S.Ct. at 2191. The *Rauscher* Court stated with regard to this doctrine of specialty, that:

"[A] person who has been brought within the jurisdiction of the court *by virtue of proceedings under an extradition treaty,* can only be tried for one of the offences described in that treaty, and for the offence with which he is charged in the proceedings for his extradition ..."

*Alvarez–Machain,* ⸺ U.S. at ⸺, 112 S.Ct. at 2191 (quoting *Rauscher,* 119 U.S. at 430, 7 S.Ct. at 246) (emphasis added).

The *Alvarez–Machain* Court reasoned that the forcible kidnapping of the Mexican national was not a "proceeding under an extradition treaty" and therefore, no extradition occurred. Moreover, the Court did not, as Trujillo requests in this case, consider the forcible abduction of the Mexican national to be a "de facto extradition" which would give rise to the application of the Doctrine of Specialty and the protections that are associated with it. Furthermore, the *Alvarez–Machain* Court expressly declined to imply into

the United States–Mexico Extradition Treaty a term prohibiting international abductions, stating that "to imply from the terms of this [extradition] Treaty that it prohibits obtaining the presence of an individual by means outside of the procedures the Treaty establishes requires a much larger inferential leap", which the Court declined to take. *Id.* at ⸺, 112 S.Ct. at 2196. Thus, in *Alvarez–Machain,* the forcible abduction of the individual from Mexico to the United States constituted neither extradition, nor "de facto" extradition, nor did the abduction constitute a violation of the Extradition Treaty between the United States and Mexico. As such, the United States had jurisdiction to try the Mexican defendant for his violations of the criminal laws of the United States.

In this case, the Extradition Treaty between the United States and the United Kingdom does not address the procedures by which Defendant alleges that he was brought to the United States. Accordingly, under *Alvarez–Machain,* Defendant was not "brought within the jurisdiction of the court *by virtue of proceedings under an extradition treaty.*" He was, therefore, not extradited, and the Court declines to conclude that the procedures by which Trujillo contends that his presence was obtained constitute a "de facto" extradition. Even under Defendant's version of the facts, his presence was not obtained in violation of the Extradition Treaty between the United States and the United Kingdom. Therefore, as in *Alvarez–Machain,* the Doctrine of Specialty does not deprive this Court of jurisdiction.

## B. *Extradition Treaties*

■ Defendant's next contention in support of his Motion to Repatriate is that the process used to obtain his presence in the United States violated international treaties. Extradition treaties exist between the United States and the United Kingdom, and between the United States and Columbia, copies of which are attached to the Government's brief. (*See* D.I. 76, Attachments 4, 5). According to the Defendant, an extradition treaty also exists between the United Kingdom and Columbia.

It is well-settled that "extradition treaties are made for the benefit of the governments concerned." *United States v. Cordero*, 668 F.2d 32, 37 (1st Cir.1981) (citations omitted). Therefore, "it is the contracting foreign government, not the defendant, that would have the right to complain about a violation." *Id.* at 38. *Accord United States v. Martinez*, 755 F.Supp. 1031, 1034 (N.D.Ga.1991) ("absent any objection or protest by the foreign government, an individual has no standing to assert a treaty violation.").

With regard to Defendant's contention that the Extradition Treaty between the United States and the United Kingdom has been violated, it is clear that, absent a protest by the United Kingdom, Defendant is without standing to complain about any alleged violation of this treaty. *See Martinez*, 755 F.Supp. at 1034 ("absent any objection or protest by the foreign government, an individual has no standing to assert a treaty violation."). On the record before the Court, the United Kingdom has not lodged an objection or protest with regard to its treaty with the United States. Defendant is, therefore, without standing to do so.

■ Trujillo also argues that, under *United States v. Zabaneh*, 837 F.2d 1249 (5th Cir.1988), he has "standing to object his illegal extradition if either England, or his native country of Columbia, files a formal protest." (D.I. 74, at 3). In other words, Defendant seems to argue that his native country of Columbia has standing to pose an objection or protest with regard to claimed violations of the Extradition Treaty between the United States and the United Kingdom. This Court does not agree that *Zabaneh* stands for such a general proposition and believes that any such suggestion by the *Zabaneh* court is dicta.[4] Rather, it appears

to the Court that, because Columbia is not a contracting party to the United States–United Kingdom Extradition Treaty, Columbia would also be without standing to complain about a violation of this Treaty.[5]

■ If Defendant contends that the Extradition Treaty between the United States and Columbia has been violated, then Defendant has failed to demonstrate or explain any such violation. The Court observes that the Extradition Treaty between Columbia and the United States provides in part that the "Contracting Parties agree to extradite to each other ... persons found in the territory of one of the Contracting Parties who have been charged with an offense ..." (*See* D.I. 76, Attachment 5, Article 1(1)). Because Trujillo was not "found in the territory" of Columbia, it is apparent that this Treaty is inapplicable. Trujillo asserts, however, that "the removal of Trujillo was carried out in violation of international and Columbian law since the removal did not proceed under an extradition treaty." (D.I. 74, at 3). This argument suggests that the removal of an individual from one country to another *must* proceed under an extradition treaty if such a treaty exists. In support of this proposition, Defendant cites *United States v. Martinez*, 755 F.Supp. 1031. The *Martinez* court, however, rejected this very proposition and quoted *United States v. Cordero*, 668 F.2d 32, for its statement that:

"To hold that extradition treaties *forbid* foreign nations to return criminal defendants except in accordance with the formal procedures they contain, would insofar as we are aware, represent a novel interpretation of those treaties."

*Martinez*, 755 F.Supp. at 1036 (quoting *Cordero*, 668 F.2d at 37–38) (emphasis in original). Thus, Defendant's argument that

---

4. In *Zabaneh*, the defendant was a citizen of Belize who travelled to Guatemala City, where he was detained by United States officials and subsequently transported to the United States. In considering the defendant's argument that the United States lacked jurisdiction to try him, the court stated that "[b]ecause neither Guatemala nor Belize protested appellant's detention and removal to the United States, appellant lacks standing to raise the treaties as a basis for challenging the court's jurisdiction." *Zabaneh*, 837 F.2d at 1261. This statement suggests that any

protest by defendant's native country of Belize would have been made pursuant to an alleged violation of the Treaty between the United States and Belize. In this case, however, Trujillo has not established any violation of the Treaty between the United States and Columbia. (*See infra*).

5. In any event, on the present record, Columbia has not made any such complaint.

*Martinez* stands for the proposition that his removal from the United Kingdom was required to have been conducted pursuant to an extradition treaty must fail. Defendant has thus failed to demonstrate a violation of the Extradition Treaty between Columbia and the United States.[6]

To the extent that Defendant claims that his removal from the United Kingdom constitutes a violation of the Treaty between the United Kingdom and Columbia, this argument must also fail because the United States is not a party to that Treaty. Defendant's Motion to Repatriate must, therefore, be denied.

---

6. In any event, notwithstanding Defendant's failure to demonstrate a violation of the Treaty between the United States and Columbia and the fact that the Court has found that Treaty to be inapplicable here, absent a formal protest or objection by the Columbian government, Defendant has no standing even to assert such a violation. In his Memorandum in Support of his Motion to Repatriate, which is dated September 22, 1994, Defendant indicated that he would "supplement the record upon the final issuance of Columbia's position on this matter." (D.I. 74, at 3–4). To date, Defendant has not demonstrated that Columbia has lodged an objection or protest with regard to the Extradition Treaty between Columbia and the United States. Defendant, therefore, lacks standing to assert such a violation.